THE STATE FARMING COMPANY, INC., ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 82920–82922. Filed July 31, 1963.

---

[1] Proceedings of the following petitioners are consolidated herewith: Edward K. Koda, Docket No. 82921; and William S. Koda and Jean Y. Koda, Docket No. 82922.

*Jerry Phelan*, for the petitioner.
*Donald G. Daiker*, for the respondent.

OPINION

FORRESTER, *Judge:* Respondent has determined the following deficiencies in income tax:

| Docket No. | Petitioner | Year | Amount |
|---|---|---|---|
| 82920 | The State Farming Company, Inc. | 1955 | $2,344.61 |
| 82921 | Edward K. Koda | 1953 | 7,223.02 |
| 82922 | William S. and Jean Y. Koda | 1953 | 4,916.12 |

Certain adjustments have been agreed to and the remaining issues for our determination are as follows:

(1) Whether the Commissioner may disallow certain net operating loss deductions by adjusting income in years prior to those covered in the statutory notices of deficiency when the relevant prior years are barred for deficiency purposes by the statute of limitations.

(2) Whether any part of a payment of $127,969.86 received in 1952 from the State of California constitutes taxable income to petitioner, the State Farming Co., Inc., or, in the alternative, to the individual petitioners.

(3) If the payment was received by State Farming, whether petitioners Edward K. Koda and William S. Koda received constructive dividends in 1952 from petitioner, the State Farming Co., Inc.

All of the facts have been stipulated and are so found.

The State Farming Co., Inc. (hereinafter referred to as State Farming), is a corporation organized on November 4, 1927, under the laws of the State of California. It filed corporate income tax returns for the calendar years 1951, 1952, 1953, and 1955 with the district director of internal revenue, San Francisco, Calif.

Edward K. Koda (hereinafter sometimes referred to as Edward) is an individual with mailing address at South Dos Palos, Calif., who filed individual income tax returns with the district director of internal revenue, San Francisco, Calif., for the calendar years 1952 and 1953.

William S. Koda and Jean Y. Koda (hereinafter sometimes referred to as William or Jean) are husband and wife with mailing address at South Dos Palos, Calif., who filed individual income tax returns with the district director of internal revenue, San Fran-

cisco, Calif., for the calendar years 1952 and 1953. Jean Y. Koda is a party solely by virtue of the filing of joint returns.

William and Edward have at all times been the sole stockholders of State Farming and own 29/48ths and 19/48ths, respectively, of the outstanding stock of State Farming.

Prior to 1943, State Farming was engaged in farming on its own lands located near South Dos Palos, Merced County, State of California.

In 1943, there existed in California a statute commonly referred to as the Alien Land Law, an initiative measure approved at an election on November 2, 1920, effective December 9, 1920, California Stats. 1921, p. lxxxvii,[2] as amended. The Alien Land Law generally provided that certain natural persons, companies, associations, and corporations were precluded from owning land within the State of California and that if any land was owned in violation of the law, the land would escheat to the State of California.

In 1943, the State of California brought an action against State Farming based upon the Alien Land Law as originally enacted. This action was to have the land owned by State Farming escheat to the State of California, in accordance with section 7 of said Alien Land Law.

On May 8, 1943, State Farming and the State of California entered into a compromise agreement whereby State Farming would sell its lands and, from the proceeds of the sale, a payment of $100,000 would be made to the State of California in full satisfaction of the action then pending.

Pursuant to this agreement, the corporation lands were sold and a payment of $100,000 was made to the State of California in 1943. In 1943, State Farming reported a net operating loss of $128,742 on its income tax return, computed as follows:

| | |
|---|---|
| Net loss—ordinary | $22,261.27 |
| Loss on sale of land and equipment | 106,480.73 |
| Net loss per return | 128,742.00 |

The loss claimed on the sale of land and equipment in the amount of $106,480.73 was computed as follows:

| | | |
|---|---|---|
| Land | | $200,000.00 |
| Improvements, machinery and equipment, rice mill | | 41,200.00 |
| Autos and farm implements | | 20,000.00 |
| Total | | 261,200.00 |
| Less: | | |
| Payment to State of California in settlement of suit to release title | $100,000.00 | |
| Title transfer fees | 4,440.51 | 104,440.51 |
| Net proceeds | | 156,759.49 |

[2] Erroneously stipulated as p. lxxxiii.

Less:

    Costs or other bases adjusted for accumulated
      depreciation:

| | | |
|---|---:|---:|
| Land and water rights | $204,198.29 | |
| Buildings and improvements | 24,212.26 | |
| Machinery and equipment | 34,199.17 | |
| Office furniture | 632.50 | $263,240.22 |
| Net loss on sale | | 106,480.73 |

State Farming's 1943 tax return was examined by the Internal Revenue Service following its filing. As a result of this examination, a revised net loss for 1943 was determined as follows:

| | | |
|---|---:|---:|
| Loss on sale of assets per return | | $106,480.73 |
| Miscellaneous additional deductions, net | | 20,000.00 |
| Total | | 126,480.73 |
| Ordinary net operating loss per return | $22,261.27 | |
| Miscellaneous additional deductions, net | 3,050.45 | 25,311.72 |
| Revised net loss for 1943 | | 151,792.45 |

As a result of the allowance of a net loss for 1943 of $151,792.45, carryback losses from 1943 to 1941 and 1942 and carryover losses to 1944 were allowed. They resulted in refunds paid to State Farming as follows:

| | Carryback adjustment | Refund |
|---|---:|---:|
| Carryback adjustment to 1941 | $64,621.19 | |
| Overassessment—income tax | | $17,732.27 |
| Overassessment—excess profits tax | | 8,692.02 |
| Carryback adjustment 1942 | 49,630.12 | |
| Overassessment—income tax | | 6,292.43 |
| Overassessment—excess profits tax | | 1,648.79 |
| Carryover adjustment 1944 | 1,712.64 | |
| Total | 115,963.95 | 34,365.51 |
| Unused portion of 1943 loss | 35,828.50 | |
| 1943 loss | 151,792.45 | |

On July 23, 1951, a new section was added to the Alien Land Law, reading as follows (Cal. Stats. 1951, ch. 1714, p. 4035) :[3]

Sec. 9.5. The provisions of subdivision (a) of Section 9 of this act, as amended by the Statutes of 1945, Chapter 1129, having been declared unconstitutional by the United States Supreme Court, upon claim of any United States citizen defendant in an escheat action who made a compromise settlement or whose property was escheated prior to such decision, or his successor in interest, there shall be refunded the total amount paid by such defendant to the State under compromise or realized by the State from him or from his property under this act. Refunds shall bear interest at the rate of 3 percent

[3] Erroneously stipulated as page 3600.

per annum from the date such moneys were deposited in the State Treasury, to a date preceding the date of the refund warrant by not more than 30 days, as determined by the Controller. Any claim for refund under this section may be filed with the State Controller not later than six months after the effective date of this section. The Controller shall audit the claim and draw his warrant for the amount determined to be due.

There is hereby appropriated from the State Treasury the amount sufficient to pay refunds and interest under this section. That portion of the moneys to be refunded that was deposited in the School Land Fund shall be paid from that fund, and the balance to be refunded, including interest, shall be paid from the general fund.

On or about October 1, 1952, the State of California, in accordance with the foregoing section, issued a check made payable to State Farming, William, and Edward, in the sum of $127,969.86. This amount represented the refund of the $100,000 paid by State Farming in 1943 and interest at the rate of 3 percent per annum in the sum of $27,969.86.

At all times material hereto, Edward, William, and Jean were citizens of the United States.

On October 7, 1952, Edward and William deposited with the Bank of America, Dos Palos, Calif., the check for $127,969.86. On the back of the check was the printed designation "The State Farming Co Inc" and the signatures of Edward and William. The bank account was designated "Edward K. or William S. Koda, Special Account."

No part of the payment of $127,969.86 was included in income by State Farming, Edward, or William and Jean. The 1952 corporate income tax return for State Farming was filed on March 16, 1953. The individual income tax returns of Edward and William and Jean for the calendar year 1952 were filed on March 22, 1953; requests for extensions of time for filing had been granted to May 15, 1953. To date, the Commissioner has not issued statutory notices of deficiency to any petitioner for the calendar year 1952.

State Farming, on its income tax returns filed for the years 1950 to 1955, inclusive, reported net income (or loss), before net operating loss deduction, as follows:

| | |
|---|---:|
| 1950 | $8. 57 |
| 1951 | (25. 00) |
| 1952 | (2, 311. 90) |
| 1953 | (2, 743. 50) |
| 1954 | (2, 743. 50) |
| 1955 | 20, 896. 50 |

State Farming claimed a net operating loss deduction on its income tax return for 1955 of $7,815.33 computed as follows:

| | | |
|---|---|---|
| 1951 net loss | $25.00 | |
| Less: Carryback to 1950 | 8.57 | $16.43 |
| 1952 net loss | | 2,311.90 |
| 1953 net loss | | 2,743.50 |
| 1954 net loss | | 2,743.50 |
| | | 7,815.33 |

In the statutory notice of deficiency issued to State Farming for the year 1955, the $7,815.33 net operating loss deduction was disallowed on the basis that $40,953.42 of the total payment received from the State of California in 1952 constituted taxable income to the corporation. Since the adjustment produced a net profit for the year 1952, the Commissioner determined that the corporation was not entitled to a net operating loss carryover from 1951, 1952, 1953, and 1954 to 1955.

On the income tax returns filed by William and Jean for the calendar years 1952 and 1953, net income was reported as follows:

| | 1952 | 1953 |
|---|---|---|
| Income from partnership | $11,453.55 | $13,554.85 |
| Rental income | 1,877.14 | 1,292.78 |
| | 13,330.69 | 14,847.63 |

Net operating loss deductions:

| | 1950 | 1951 |
|---|---|---|
| Adjusted gross income | $3,053.45 | ($29,057.01) |
| Carryback loss to 1950 | (3,053.45) | 3,053.45 |
| Carryover loss to 1952 | (26,003.56) | (26,003.56) |
| Carryover loss to 1953 | (12,672.87) | (12,672.87) |
| Net income (or loss) per return | (12,672.87) | 2,174.76 |

The Commissioner in the statutory notice of deficiency issued to William and Jean for the calendar year 1953 disallowed the net operating loss carryover from the year 1952 in the amount of $12,672.87. The basis for this adjustment was that William and Jean had received a constructive dividend from State Farming in 1952 in the amount of $44,992.30. Inclusion of this dividend income in 1952 would result in revised net income for the calendar year 1952, determined by the Commissioner, as follows:

| | | |
|---|---|---|
| (Loss) per return | | ($12,672.87) |
| Adjustments: | | |
| Dividend income | $44,992.30 | |
| Capital gain | ¹698.39 | 45,690.69 |
| | | 33,017.82 |
| Standard deduction | | 1,000.00 |
| Corrected net income | | 32,017.82 |

¹ The amount received in excess of the earnings of State Farming was treated as a return of capital.

Since the adjustment produced net income for the year 1952, the Commissioner determined that William and Jean were not entitled to a net operating loss carryover from 1951 and 1952 to 1953.

On the income tax returns filed by Edward for the calendar years 1952 and 1953, net income was reported as follows:

|  | 1952 | 1953 |
|---|---|---|
| Income from partnership | $11,453.54 | $13,554.85 |

Net operating loss deductions:

|  | 1950 | 1951 |  |  |
|---|---|---|---|---|
| Adjusted gross income | $480.18 | ($30,989.69) |  |  |
| Carryback loss to 1950 | (480.18) | 480.18 |  |  |
| Carryover loss to 1952 |  | (30,509.51) | (30,509.51) |  |
| Carryover loss to 1953 |  |  | (19,055.97) | (19,055.97) |
| Net (loss) per return |  |  | (19,055.97) | (5,501.12) |

The Commissioner in the statutory notice of deficiency issued to Edward for the calendar year 1953 disallowed the net operating loss deduction of $19,055.97. The basis for this adjustment was that Edward had received a constructive dividend from State Farming in 1952 in the amount of $29,477.72. Inclusion of this dividend income in 1952 would result in revised net income for the calendar year 1952, determined by the Commissioner as follows:

| (Loss) per return |  | ($19,055.97) |
|---|---|---|
| Adjustments: |  |  |
| Dividend income | $29,477.72 |  |
| Capital gains | [1] 457.57 | 29,935.29 |
|  |  | 10,879.32 |
| Standard deduction |  | 1,000.00 |
| Corrected net income |  | 9,879.32 |

[1] The amount received in excess of the earnings of State Farming was treated as a return of capital.

Since the adjustment would result in net income for the year 1952, the Commissioner determined that Edward was not entitled to a net operating loss carryover from 1951 and 1952 to 1953.

State Farming had total income tax benefits of $64,171.50 attributable to the 1943 $100,000 escheat payment, computed as follows:

| Carryback adjustment—1941 |  | $64,621.19 |
|---|---|---|
| Loss for the year 1943 as adjusted | $151,792.45 |  |
| Less: 1943 escheat payment | 100,000.00 |  |
| Net operating loss for 1943 deduction in 1941 attributable to other than 1943 escheat payment |  | 51,792.45 |
| Income eliminated by 1943 escheat payment—1941 |  | 12,828.74 |
| Carryback adjustment—1942 |  | 49,630.12 |
| Carryback adjustment—1944 |  | 1,712.64 |
| Total income benefits attributable to 1943 escheat payment |  | 64,171.50 |

The first issue is whether the Commissioner properly disallowed net operating loss deductions by adjusting incomes in years prior to those covered in the statutory notices of deficiency. Such adjustments converted previously claimed calendar year losses to profits and resulted in determinations that no net operating loss deductions existed to be carried to years which were covered in the statutory notices of deficiency.[4]

Petitioners assert that 1952, the year in which California made the payment, is a taxable year for which the statute of limitations has run. They aver that the Commissioner cannot recompute the proper amount of income for a barred year in order to determine the proper net operating loss carryover to an open year. While the Commissioner does not dispute that 1952 is barred, he argues that the proper amount of income for 1952 can be recomputed to affect net operating loss carryovers to the open years 1953 and 1955.

Recomputations of barred years' income for determinations of allowable net operating loss carrybacks have been upheld as proper. *Phoenix Coal Co.* v. *Commissioner*, 231 F. 2d 420 (C.A. 2), affirming a Memorandum Opinion of this Court; *Commissioner* v. *Van Bergh*, 209 F. 2d 23 (C.A. 2), remanding 18 T.C. 518 on a ground not considered by us.

Petitioners argue that these cases are distinguishable. They assert that taxpayers "invite" reopening prior years when they claim refunds based on carrybacks since the refunds are dependent on barred years. They aver that said alleged invitation is not proffered in a carryforward situation where the taxpayer is not claiming a refund of formerly paid taxes.

Petitioners do not offer any authority for the proposition that we should have one rule for loss carrybacks and another for loss carryforwards. Indeed, some cases have allowed the recomputation in carryover situations. *W. M. Ritter Lumber Co.*, 30 B.T.A. 231, 277 (issue

---

[4] The relevant statutory provisions are sec. 122. I.R.C. 1939, and sec. 172 I.R.C. 1954. All statutory references are to the I.R.C. 1939, unless otherwise stated.

Under sec. 122(a) and sec. 172(c), I.R.C. 1954, the term "net operating loss" means the excess of the deductions allowed over the "gross income" for the taxable year. Under sec. 122(b), the net loss for any taxable year beginning after Dec. 31, 1949, shall be a net operating loss carryback for the preceding taxable year and a net operating loss carryover for each of the 5 succeeding taxable years. Under sec. 172(b)(1), I.R.C. 1954, as originally enacted, a net operating loss for any taxable year ending after Dec. 31, 1953, shall be carried back to each of the 2 preceding taxable years and carried over for each of the 5 succeeding years.

In applying the relevant Code sections to State Farming, a 1951 loss must first be carried back to 1950 and if 1950 income does not absorb the loss, it may be carried over to the 5 succeeding taxable years. Likewise, a 1953 loss is first carried back to 1952 and a 1954 loss is first carried back to 1952 and then to 1953. Therefore, in the instant situation, if the year 1952 showed a profit in excess of the unused losses of 1951, 1953, and 1954, and if the Commissioner could properly recompute the 1952 income to show such a profit, no remaining unused loss would exist to be carried over to 1955. Similarly, if 1952 showed a profit for Edward and William in excess of the unused net operating loss carryforwards, no remaining unused loss would exist to be carried over to 1953.

34) ; *Lord Forres*, 25 B.T.A. 154; *Phoenix Electronics, Inc.* v. *United States*, 164 F. Supp. 614 (D. Mass. 1958). See Rev. Rul. 56–285, 1956–1 C.B. 134. Petitioners argue that these cases are distinguishable in that they did not consider the "invitation" theory.

We have considered petitioners' theory and we believe that the above-cited authorities should be followed. The purpose of the carryover provisions will not brook the result that petitioners assert. The carryover concept was first introduced in the 1918 Revenue Act. It was then stated that yearly reporting alone "does not adequately recognize the exigencies of business, and * * * may often result in grave injustice." S. Rept. No. 617, 65th Cong., 3d Sess., p. 7 (1918). In the reports on the Internal Revenue Code of 1939, it was stated that the purpose of the carryover provisions is to redress the situation where:

a business with alternating profit and loss is required to pay higher taxes over a period of years than a business with stable profits, although the average income of the two firms is equal.

Similarly, a carryback provision was added in 1942 in order "To afford relief to * * * hardship cases." (S. Rept. No. 1631, 77th Cong., 2d Sess., p. 52 (1942).) The purpose of the carryover provisions is, therefore, to partially mitigate the sometimes harsh result of the yearly concept of reporting income. It was not intended, however, to place a taxpayer in a better position than he would have been had losses and subsequent income occurred in a single year. Yet, if the events of 1950 through 1955 had occurred in a single year, and if the payment from California is deemed income to State Farming and a constructive dividend to individual petitioners, no net operating loss would be available for any of the petitioners. We do not believe the purpose of the carryover provisions will allow us to place petitioners in a better position because the relevant events were spread over a period of time rather than in a single year.

Furthermore, while the statute of limitations may bar the assertion of a deficiency for 1952, the actual fact of the payment remains. This Court may consider such facts of other years as may be necessary to a proper determination of a deficiency for an open year. Sec. 272 (g) ; [5] sec. 6214(b), I.R.C. 1954; [6] *W. M. Ritter Lumber Co., supra*.

---

[5] SEC. 272. PROCEDURE IN GENERAL.

(g) JURISDICTION OVER OTHER TAXABLE YEARS.—The Board in redetermining a deficiency in respect of any taxable year shall consider such facts with relation to the taxes for other taxable years as may be necessary correctly to redetermine the amount of such deficiency, but in so doing shall have no jurisdiction to determine whether or not the tax for any other taxable year has been overpaid or underpaid.

[6] SEC. 6214. DETERMINATIONS BY TAX COURT.

(b) JURISDICTION OVER OTHER YEARS.—The Tax Court in redetermining a deficiency of income tax for any taxable year or of gift tax for any calendar year shall consider such facts with relation to the taxes for other years as may be necessary correctly to redetermine the amount of such deficiency, but in so doing shall have no jurisdiction to determine whether or not the tax for any other year has been overpaid or underpaid.

If petitioners had income in 1952, we may consider that fact in determining a deficiency for the open years of 1953 or 1955. Petitioners assert that these sections are procedural rules which should not be allowed to influence the substantive result and create a conflict with the District Courts. Petitioners have not cited any District Court holdings contrary to our substantive view on this matter and we believe that our view would be followed in any court, as it in fact was in *Phoenix Electronics, Inc., supra;* see also *Springfield Street Railway Co.* v. *United States,* 312 F. 2d 754 (Ct. Cl.).

We therefore hold that the Commissioner was not barred by the statute of limitations from redetermining the taxable income of State Farming for 1952 in order to compute the proper net operating loss carryover to 1955. Furthermore, the Commissioner was not barred by the statute of limitations from redetermining the taxable income of Edward, William, and Jean for 1952 for the purpose of determining their proper net operating loss carryovers to 1953.

Having decided that the statute of limitations is not a bar in the instant proceeding, we now move to the substantive question of whether the payment of $127,969.86 received in 1952 from the State of California constituted taxable income to State Farming or to the individual petitioners.

Respondent argues that the payment was made by California to State Farming and that the shareholders derived the proceeds from said payment through a constructive dividend. Petitioners argue that the payment was made directly from California to the individual petitioners or, in the alternative, that the payment was made severally to State Farming, Edward Koda, and William Koda, and that, in any event, it was a nontaxable gift.

The chronology of material events is as follows:

1. *1948:* Decision of United States Supreme Court holding unconstitutional a portion of the California Alien Land Law. *Oyama* v. *California,* 332 U.S. 633.

2. *July 1951:* California enactment of statute providing in part: [U]pon claim of any United States citizen defendant in an escheat action who made a compromise settlement or whose property was escheated prior to such decision, or his successor in interest, there shall be refunded the total amount paid by such defendant to the State under compromise or realized by the State from him or from his property under this act. Refunds shall bear interest at the rate of 3 percent per annum * * *.

3. *April 2, 1952:* California Senate concurrent resolution urging State officers to handle the claims for refund expeditiously.[7]

--------
[7] WHEREAS, By the enactment of Chapter 1714 of the Statutes of 1951 the Legislature of the State of California provided some redress to citizens of the United States whose property had been escheated pursuant to the Alien Land Law of California; and

WHEREAS, The motivating purpose behind that legislation was to promote the public welfare by demonstrating to all citizens that even injustices brought about by wartime prejudices are eventually corrected by the democratic processes, thereby ensuring the loyalty and support of all groups of citizens during the present period of international strain; and

784

4. *April 17, 1952:* Decision of California Supreme Court holding unconstitutional the entire Alien Land Law. *Sei Fujii* v. *State,* 38 Cal. 2d 718, 242 P. 2d 617.

5. On or about *October 1, 1952:* Check for $127,969.86 issued by the State of California made payable to State Farming, William Koda and Edward Koda.

6. *October 7, 1952:* Deposit of said check in a special account designated as "Edward K. or William S. Koda, Special Account."

7. *July 1953:* California statute enacted providing that *any* defendant damaged by an Alien Land Law escheat action could recover.[8]

The payees listed on the warrant of payment were the corporation, State Farming, and its sole shareholders, William and Edward. The warrant was deposited in a special account of the sole shareholders. Respondent's position is, in substance, that petitioners have not met

WHEREAS, The persons to whom this remedy was extended by that statute are now engaged in presenting their claims pursuant to said statute; now, therefore, be it

*Resolved by the Senate of the State of California, the Assembly thereof concurring,* That all state officers are urged to handle said claims as expeditiously as possible, bearing in mind the public purpose to be served thereby. (Senate Concurrent Resolution No. 11, California Stats. 1953, 1952 First Extraordinary Session, Ch. 15, p. 418.)

[8] Sec. 16. This act having been declared unconstitutional by the California Supreme Court, any defendant named in an escheat action pursuant to this act in which a compromise settlement was made or property was escheated prior to such decision, or his successor in interest, shall, upon compliance with this section, be entitled to a refund of all money, or such portion thereof as the court deems equitable, which has been paid to the State under compromise settlement or realized by the State from the property escheated under this act. Refunds shall bear interest at the rate of 3 percent per annum from the date such moneys were deposited in the State Treasury to a date preceding the date of the refund warrant by not more than 30 days, as determined by the Controller.

Any such person may, before April 1, 1954, file a verified petition in the Superior Court of the County of Sacramento showing his claim or right to the refund. The petition shall name as parties respondent any persons other than the petitioner who were defendants in the escheat action to which the petition is filed.

A copy of the petition must be served, within the time and in the manner provided for service of summons in a civil action, on the Attorney General and on the Controller and on all parties respondent, who may answer the same at their discretion and may assert any claims adverse to the claim of the petitioner, within the time and in the manner provided for in civil actions. A copy of such answer must be served on the Attorney General, the Controller and on all other parties petitioner and respondent. In the event an answer asserts, for the first time in the proceeding, claim to the refund or a portion thereof, the Attorney General, the Controller, and all other parties petitioner and respondent may answer same within the time and in the manner provided in this section for answer to the petition. When all parties have had the opportunity to answer and the matter is at issue the court shall set the matter for hearing. The court shall thereupon try the issue as issues are tried in civil actions. The court shall determine the person or persons entitled to the refund and shall grant each such person a certificate under seal of the court stating the amount of the refund to which he is entitled. The court shall make its determination without regard to technicalities of title and shall give weight to the equitable merits of the various claims, and the fact that the payment to the State was made by any particular claimant shall not be controlling.

No costs of suit shall be allowed against the State of California in any action or proceeding had under this section.

Upon presentation of such certificate the Controller shall draw his warrant for the amount of the refund determined to be due.

When payment is made by the State pursuant to a petition filed under this section, no suit may thereafter be maintained against the State or any officer thereof for or on account of moneys derived from the escheat action with reference to which the petition was filed and payment made.

There is hereby appropriated from the State Treasury the amount sufficient to pay refunds and interest under this section. That portion of the moneys to be refunded that was deposited in the School Land Fund shall be paid from that fund, and the balance to be refunded, including interest, shall be paid from the General Fund. (Cal. Stats. 1953, ch. 1816, pp. 3600, 3601)

their burden of proving that respondent was in error when he determined that a payment, taxable as income, was made to State Farming.

We first consider petitioner's contention that the payment was a gift. Section 22 defines income broadly and then allows an exemption for "gifts." Sec. 22(b)(3).[9] Neither the statutes nor the decisional law provide an inclusive definition of the term "gift." See *Commissioner* v. *Duberstein,* 363 U.S. 278; *Bogardus* v. *Commissioner,* 302 U.S. 34. The principles which must guide us in this question have been stated as follows (*Commissioner* v. *Duberstein, supra* at 285–286, 289):

the statute does not use the term "gift" in the common-law sense, but in a more colloquial sense. * * * a voluntarily executed transfer of his property by one to another, without any consideration or compensation therefor, though a common-law gift, is not necessarily a "gift" within the meaning of the statute. * * * the mere absence of a legal or moral obligation to make such a payment does not establish that it is a gift. * * * And, importantly, if the payment proceeds primarily from "the constraining force of any moral or legal duty," * * * it is not a gift. * * * A gift in the statutory sense * * * proceeds from a "detached and disinterested generosity," * * * "out of affection, respect, admiration, charity or like impulses." * * * And in this regard the most critical consideration * * * is the transferor's "intention." * * *

*   *   *   *   *   *   *

Decision of the issue presented in these cases must be based ultimately on the application of the fact-finding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case. * * * primary weight in this area must be given to the conclusions of the trier of fact. * * *

Noting that petitioners have the burden of proof on this question, we must now apply our "experience with the mainsprings of human conduct to the totality of the facts" of this case. *Commissioner* v. *Duberstein, supra* at 289.

Viewing the record as a whole, it is our conclusion that the payment from the State of California was income and was not a gift as comprehended by section 22(b)(3).

Petitioners assert that the payment was a matter of legislative grace; a conscience payment designed to ensure the loyalty of all groups of citizens. To this effect they cite a California Senate Concurrent Resolution[10] urging State officers to handle escheat claims expeditiously, which contained the following:

WHEREAS, The motivating purpose behind that legislation was to promote the public welfare by demonstrating to all citizens that even injustices brought about by wartime prejudices are eventually corrected by the democratic proc-

---

[9] SEC. 22. GROSS INCOME.

(b) EXCLUSIONS FROM GROSS INCOME.—The following items shall not be included in gross income and shall be exempt from taxation under this chapter:

*   *   *   *   *   *   *

(3) GIFTS, BEQUESTS, DEVISES, AND INHERITANCES.—The value of property acquired by gift, bequest, devise, or inheritance. * * *

[10] Stated in full at footnote 7.

esses, thereby ensuring the loyalty and support of all groups of citizens during the present period of international strain; * * *

A "gift" is not established by the absence of a binding legal obligation on California. *Commissioner* v. *Duberstein, supra.* Indeed, a "moral obligation" would be important evidence of the existence of income. *Commissioner* v. *Duberstein, supra.* In the instant case, a sum was extracted from a corporation solely by virtue of the fact that its sole shareholders were United States citizens of Japanese descent. The State statute was in part subsequently held unconstitutional and the State decided to refund the money. It might very well be that a "moral obligation" for repayment of unconstitutionally seized property arose. "[I]f the payment proceeds primarily from 'the constraining force of any moral * * * duty,' * * * it is not a gift." *Commissioner* v. *Duberstein, supra* at 285.

Furthermore, the statute granting the payment stated that "there shall be *refunded* the total amount paid" and that Refunds shall bear *interest.*" "Refunds" and "interest" are not usually accepted words of donative intent. They generally signify the repayment of a sum of money, not a gift.

Moreover, the California Constitution, article IV, section 31, prohibits the State and its subdivisions from making any gifts of public money to any noncharitable corporation or individual. See *Lamb* v. *Board of County Peace Officers R. Commission,* 29 Cal. App. 2d 348, 84 P. 2d 183. Although the term "gift" may have a different meaning for Federal tax law, the most critical factor in determining whether the payment was gift or income was the transferor's intention. *Commissioner* v. *Duberstein, supra.* The California prohibition of gifts is important evidence as to the intent of the California legislature.

The entire context of the transaction, the possible moral obligation to repay, the use of the terminology "repayment" and "interest," the payment of an exact amount previously escheated plus interest, and the California constitutional bar to bestowing gifts, lead us to the conclusion that the payment in question was not a gift.

Turning now to the identity of the recipient of the payment, we see that this case is governed by the 1951 statute, since the 1953 statute providing recovery for "any" defendant in an escheat action was not passed until almost a year after the payment was made. Petitioners argue that the 1951 statute, which uses the term "citizen defendant[s]," means that only individuals could recover. But petitioners do not offer sufficient convincing evidence to sustain their burden of proof that the California legislature intended to limit payment to individuals or that the California authorities were in fact limiting payment to individuals. The question of to whom payment was rendered is a question of fact. Petitioners have the burden of proving that the Com-

missioner erred when he determined that payment was made to State Farming. They have not sustained their burden.

It is true that the term "citizens" is not usually used to connote corporations [11] but our inquiry is into the fact of what the California authorities actually did and what the California statute actually meant. The factual pattern does not sustain petitioners' interpretation any more than Commissioner's.

The statute provides that "there shall be *refunded* the total amount *paid by such defendant* * * * *or realized* by the State from him or from his property under" the Alien Land Law. (Emphasis added.) It may be that "citizen defendant" "him" or "his" is not often used to signify corporations, but we are dealing with a burden of proof which petitioners must sustain. "Refund" connotes payment to the entity which originally paid the money to the State. Refund means "To return (money) in restitution, repayment, etc." (Webster's New Collegiate Dictionary.) The only entity which could have paid the money and have it "refunded" was State Farming. State Farming had owned the land; State Farming was the "defendant" against which the escheat action was brought; State Farming sold the land and paid the $100,000 to California; and State Farming was a payee on the payment warrant.

The California presumption that official duty is regularly performed does not aid petitioners. See Cal. Civ. Proc. Code, sec. 1963(15). If the statute were limited to individuals, respondent might have to rebut the implication that State officers acted improperly, but the statute provided for "refunds" of amounts "paid by such defendant * * * or realized from him on his property." State Farming was the "defendant" and was involved. If anything, the presumption supports the administrative interpretation which proffered the payment to State Farming by listing the corporation as a payee.[12]

The subsequent 1953 statute allowing payment to "any" defendant is also not determinative of the issue. While petitioners argue that it was an expansion of the scope of the 1951 statute, it may also be construed to show that the legislature had originally intended that corporations be payees and that the California authorities had been so construing it. Or it may be that the 1953 statute is totally distinguishable. It changed the entire procedure by requiring a civil action

---

[11] See *Asbury Hospital* v. *Cass County*, 326 U.S. 207.

"There are, of course, situations where a fiction is allowed which deems corporations to be citizens. E.g., for purposes of determining jurisdiction of the Federal courts under the requirement of diversity of citizenship, corporations are deemed citizens of their state of incorporation. *Neirbo Co.* v. *Bethlehem Corp.*, 308 U.S. 165."

[12] The result would have been the same if State Farming had not been listed as a payee on the warrant, for the rights of William and Edward were entirely derivative from their ownership of that corporation.

against the State and against any other persons who were defendants in the original escheat action while the 1951 statute provided for the filing of a claim for "refund" with the State controller. Moreover, the period for filing under the 1951 Act had expired by the time the California Supreme Court declared the entire Alien Land Law unconstitutional in April 1952. Therefore the context of the 1953 enactment was quite different.

Petitioners argue that the purpose of the 1951 law was to antidote the escheat actions and that the most effective method of doing this was direct payment to the individual shareholders. It is equally reasonable to argue that the best method of putting the injured party in its original position would be by direct payment to the corporation which lost the land.

Moreover, the meaning of the 1951 statute is only evidence regarding the factual question of to whom the payment was made. If the payment was made to State Farming, State Farming received it for Federal tax purposes, regardless of the California statute.

The face of the warrant for payment issued by California listed under the heading "payee" the State Farming Co., Inc., first, and then William S. Koda and Edward K. Koda. On the back of the warrant were the endorsements of State Farming, Edward Koda, and William Koda.

Petitioners argue, in the alternative, that it must be presumed that the three parties named on the face of the warrant had an equal claim to the total sum, but State Farming was the only "defendant" who could receive a "refund." Moreover, in California a right created in favor of several persons is presumed to be joint, not several. Cal. Civ. Code, sec. 1431. This presumption in the case of a right can be overcome only by express words to the contrary. None such exists in the case at bar. Furthermore, the fact that the warrant had three payees is not inconsistent with the fact that one payee was entitled to the entire payment and the individuals derived their interest as shareholders. It is common practice for a debtor to name as payees all those persons who may have an interest in order to obtain a release of all possible claims.

Hence, viewing the record as a whole, we must conclude that the petitioners have not established by the preponderance of the evidence that the individuals and not the corporation received the payment. Therefore, respondent's determination that State Farming received the payment from California must be sustained.

Corporations, unlike individuals, are not allowed a deduction from gross income for a portion of the net long-term gain on the sale of a capital asset. Corporations must include the entire amount of the gain in their gross incomes, subject to the capital gains tax rate. Since the instant case involves only the issue of the proper amount

of net operating loss carryforwards from 1952, it is sufficient that the entire amount of the gain be included in gross income for 1952. This is because both the 1939 and 1954 Codes define net operating loss deduction as "the excess of the deductions allowed by this chapter over the *gross income.*"[13] Therefore whether the payment is deemed ordinary income or capital gain is moot for the case at bar.

The individual shareholders deposited the warrant from California in a bank account entitled "Edward K. or William S. Koda, Special Account." We do not understand petitioners to contest that the individual shareholders had complete dominion and control over the entire amount received by State Farming from California. The facts of the case at bar show that William and Edward received a constructive dividend from State Farming in 1952.

The Commissioner is sustained in his position that the net operating loss carryovers in issue are denied.

Because of agreed adjustments,

*Decision will be entered under Rule 50.*