BATON ROUGE SUPPLY COMPANY, INC., PETITIONER, *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT.

Docket No. 71320. Filed April 10, 1961.

*Harvey H. Posner, Esq.,* and *Fred Blanche, Esq.,* for the petitioner.
*Jackson L. Bailey, Esq.,* for the respondent.

TRAIN, *Judge:* Respondent determined a deficiency in petitioner's
income tax for the fiscal year ending March 31, 1956, in the amount of
$39,385.83. The issues for decision are as follows:

(1) Whether Ira Eugene Barksdale and William H. LeBlanc, Jr.,
acquired the capital stock of petitioner for the principal purpose of
evading or avoiding Federal income tax by securing to themselves a
deduction, credit, or other allowance which they would not otherwise
have enjoyed; and

(2) Whether petitioner is entitled to a bad debt deduction of
$1,200.72 for the fiscal year ended March 31, 1956.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are hereby found as
stipulated.

Baton Rouge Supply Company, Inc. (hereinafter referred to as
petitioner), is a corporation organized under the laws of Louisiana in
1935. Petitioner filed a corporate income tax return for the fiscal
year ended March 31, 1956, with the district director of internal reve-
nue for the district of Louisiana.

Walter Pilcher, Sr. (hereinafter referred to as Pilcher), was the
president of petitioner and was the owner of the land and building
on which petitioner's business was conducted. The land and building
were leased to petitioner.

Petitioners' place of business was adjacent to that of Capital Build-
ers Supply Company, Inc. (hereinafter referred to as Capital Build-
ers), a corporation organized under the laws of Louisiana in 1951.
The stock of Capital Builders was owned equally by Ira Eugene
Barksdale (hereinafter referred to as Barksdale) and his wife and

1

William H. LeBlanc, Jr. (hereinafter referred to as LeBlanc), and his wife.

Barksdale and LeBlanc, in addition to their stock ownership in Capital Builders, each owned a 50 percent interest in the partnership of Barksdale & LeBlanc (hereinafter referred to as the partnership), Baton Rouge, Louisiana, organized in 1945, which is engaged in the construction business. Barkle, Inc. (hereinafter referred to as Barkle), is a corporation organized under the laws of Louisiana in 1951, and was equally and solely owned by Barksdale and LeBlanc. This corporation bought, held, rented, and leased real estate.

The accelerated growth and expansion of the business activities of Capital Builders (and its unincorporated predecessor) and the partnership, during the years 1950 to 1955 created urgent and recurring needs for more land, buildings, and storage facilities. Continuous efforts to satisfy these space requirements resulted in successive property acquisitions. On the dates indicated, Barksdale and LeBlanc. as coowners, or Barkle, made the following property acquisitions:

| Date of acquisition | Property description |
| --- | --- |
| Mar. 21, 1950 | Ira Eugene Barksdale and William H. LeBlanc, Jr., acquired from Walter Pilcher (Sr.) 13 lots (Nos. 1, 2, 3, 4, 5, 16, 17, 18, 19, 20, 21, 22, and 23) and a 40-foot strip (adjacent to lots 1, 2, 3, 4, and 5) in square 16 of Smiley Heights (which these purchasers in turn conveyed to Barkle, Inc., on October 27, 1951). |
| Dec. 6, 1950 | Ira Eugene Barksdale and William H. LeBlanc, Jr., acquired lots 10 and 11 of square 17, Smiley Heights, from Mrs. Mary F. Wells. |
| Jan. 9, 1951 | Ira Eugene Barksdale and William H. LeBlanc, Jr., acquired lot 12 of square 17, Smiley Heights, from Joe Robinson, et al. |
| Dec. 1952 | Abandonment of portions of Augustus Street and Railroad Avenue. |
| Apr. 21, 1954 | Barkle, Inc., acquired lot 13 of square 17, Smiley Heights, from Nancy Hayes. |
| Jan. 14, 1955 | Barkle, Inc., acquired lot 14 of square 17, Smiley Heights, from Joe Robinson, et ux. |
| Feb. 17, 1955 | Barkle, Inc., acquired lot 15 of square 17, Smiley Heights, from Robert L. Hamilton. |
| Nov. 22, 1955 | Ira Eugene Barksdale and William H. LeBlanc, Jr., acquired from Walter Pilcher, Sr., 10 lots (Nos. 6, 7, 8, 9, 10, 11, 12, 13, 14, and 15) and a 40-foot strip (adjacent to lots 6, 7, 8, 9, and 10) in square 16 of Smiley Heights. |

The seven respective properties which were acquired during the period of March 21, 1950, through February 17, 1955, by Barksdale and LeBlanc and Barkle, were rented or leased, upon acquisition, to Capital Builders or the partnership, and necessary improvements were forthwith erected thereon, to serve the needs of these businesses.

The tract of land first acquired in this series of acquisitions consisted of 13 contiguous lots and a 40-foot strip. This tract was acquired by Barksdale and LeBlanc on March 21, 1950, from Pilcher who, until then, owned the entirety of square 16 of Smiley Heights;

by this purchase, Barksdale and LeBlanc acquired approximately one-half of the area—the triangular shaped western portion—of square 16, and Pilcher retained the other one-half, that is, the eastern portion of said square. A large warehouse-office building and five accessory buildings (storage sheds) were erected and a railroad track was installed. However, within less than a year, additional space requirements developed, and, with the informal abandonment (subsequently formalized in December 1952) of the northernmost portion of Augustus Street, Barksdale and LeBlanc acquired, in December 1950 and January 1951, three contiguous lots in square 17, Smiley Heights, as an enlargement of the first acquired tract. On December 6, 1950, lots 10 and 11 of square 17, together with the accessory right of usage of the 40-foot strip lying between the north line of the lots and the south line of the right-of-way of Baton Rouge, Hammond and Eastern Railway were purchased from Mary F. Wells; and on January 9, 1951, lot 12 of square 17 was purchased from Joe Robinson and his coowners. On this aggregation of property lying on the west of and adjoining the first acquired tract, Barksdale and LeBlanc erected a lumber storage shed, a warehouse and a shed for lumber-cutting operations; the unimproved area provided open storage facilities and passageways.

In 1953, the necessity for additional space recurred, and again Barksdale and LeBlanc set out to purchase some of the individual lots adjoining or in the immediate area of the property occupied by Capital Builders and the partnership. Their own efforts in this direction were unproductive; the property owners refused to sell and, in at least one case, the title to the property appeared to be in doubt. Thereupon, Barksdale and LeBlanc enlisted the aid and assistance of Allen Andrews (hereinafter referred to as Andrews), a man who since 1942 had lived in the neighborhood and who knew the people in the vicinity. Barksdale and LeBlanc explained to Andrews their urgent need for more land for the expansion of their business. Through continual efforts, Andrews ultimately succeeded in consummating the acquisition of three of the lots sought.

Since 1951, as the respective acquisitions were made by Barksdale and LeBlanc or Barkle the properties were leased to Capital Builders or the partnership. Notwithstanding the respective property acquisitions aforementioned, Capital Builders and the partnership were still growing or expanding and were still in need of land. However, to the west, no property adjacent to that already acquired was available. The respective owners of lot 9 (Virginia Collins), lot 16 (Henry Carter), and four lots on the south side of Confidence Street and west side of Augustus Street (Martha Davis) refused and persisted in their refusals to sell their properties. It appeared that Capital Builders

and the partnership had expanded in that direction as far as they could. Moreover, the existence of the right-of-way of Baton Rouge, Hammond and Eastern Railway on the north and Greenwell Springs Road on the south precluded area expansion in either of these directions.

Yet the need for additional space and facilities did not abate; and by 1955 Capital Builders and the partnership were compelled to store some of their materials in a small warehouse and in a little cowbarn, both of which were some distance from their main establishment. LeBlanc and his superintendent of construction, Floyd L. Cox (hereinafter referred to as Cox), again attempted to purchase some of the property west of that theretofore acquired, but again their efforts were fruitless.

At this point, it occurred to Barksdale that, between their property and that of petitioner, Pilcher had some land that he was not using. In view of the fact that part of their original tract of land had been purchased from Pilcher, Barksdale attempted to buy an additional 100 feet of land. Petitioner occupied the entirety of the Pilcher tract but the western 100 feet, more or less, thereof was free of any buildings. Accordingly, in January 1955, Barksdale, on behalf of himself and LeBlanc, sought to purchase from Pilcher the western 100 feet of the Pilcher property adjoining the tract which they had, in March 1950, acquired from him. Pilcher refused to sell any more of his land alone because he felt that he could not adequately carry on his business on the remainder of the property. However, he offered to sell all of the land if Barksdale and LeBlanc would also buy his business.

After Barksdale informed LeBlanc of what had transpired, they decided that, inasmuch as they did not want the business and what they really needed was the land and buildings, they would try to persuade Pilcher to sell them only the property. LeBlanc was designated to pursue this objective. When LeBlanc asked Pilcher to sell just the land and buildings, Pilcher again refused but reiterated his willingness to sell the whole operation, that is, all of the land, the building, and the business. Consequently, LeBlanc entered into negotiations with Pilcher looking toward a mutually satisfactory basis for the consummation of the Pilcher proposal. Pilcher had already indicated to Barksdale that he wanted $125,000 for the real estate but the real problem lay in determining a basis for the purchase of the complete business. The negotiations between LeBlanc and Pilcher failed to produce any agreement, principally because of differences of opinion in regard to the composition and valuation of the inventory. Ultimately, while the parties were in the course of making a physical inventory of the merchandise on hand on July 4, 1955, negotiations broke down completely and were terminated.

About a month or so later, while Pilcher was in the office of a banker on another matter, the banker, who knew of the breakdown in negotiations, asked Pilcher what had happened in that regard. After some conversation, the banker contacted LeBlanc and negotiations were begun again. The renewed negotiations culminated on September 7, 1955, in the execution of the contract to purchase, whereby Barksdale and LeBlanc were to acquire from Pilcher, Walter Pilcher, Jr., and Mittie Pilcher Gillen all of the capital stock of petitioner, and whereby Barksdale and LeBlanc were to acquire from Pilcher the remaining 10 lots and 40-foot strip in square 16 of Smiley Heights, with the improvements thereon. The contract included a provision for specific performance.

In negotiating the September 7 purchase agreement, the parties resolved the question of inventory valuation, which had been the chief impasse in their first series of negotiations, by foregoing a physical inventory and, in lieu thereof, stipulating an amount ($90,000) to be assigned to the merchandise inventory in arriving at the book value of the capital stock of petitioner and by providing that Barksdale and LeBlanc were to select from the merchandise inventory a portion having a market value of $75,000, which was to be retained by the corporation. Pilcher personally was to purchase from the corporation all the remainder of the merchandise inventory for $15,000, irrespective of whether this excess inventory was in fact worth more or less than $15,000.

The September 7 purchase agreement also provided, *inter alia*, that the purchase price of the capital stock of petitioner would be a sum of money equal to the book value of the stock at the close of business of that date and that such value was to be determined by an audit of the books of account to be made by Hawthorn, Waymouth and Carroll, certified public accountants, in accordance with generally accepted accounting methods. The agreement also provided that from September 7 until the date of the execution of the deed conveying the real estate and delivery of the capital stock of petitioner, Barksdale and LeBlanc, or either of them, would be the exclusive agent or agents to conduct the affairs of petitioner. Accordingly, Barksdale and LeBlanc took over the operation of petitioner on the morning of September 8, 1955, and they have continued to manage its affairs ever since.

Howard V. Carroll (hereinafter referred to as Carroll) became a partner in the accounting firm of Hawthorn, Waymouth and Carroll in 1954. For some years Carroll had been the auditor for the petitioner as well as for Barksdale and LeBlanc. In the summer of 1955, when Barksdale and LeBlanc and Pilcher were engaged in their first series of negotiations for the Pilcher land and stock of petitioner, either Pilcher or Barksdale had called upon Carroll to make an audit

as of June 30, 1955, for the purpose of determining the book value of the stock of petitioner as of that date. When approached, Carroll attempted to beg off from the proposed engagement and requested that the parties employ another auditor since he had been the auditor for both parties. The parties, however, insisted that, because of his familiarity with the history of both interests, he and his firm should prepare the audit. Accordingly, on June 30, 1955, Carroll's firm began an audit. However, when the negotiations between LeBlanc and Pilcher broke down on the afternoon of July 4, Carroll discontinued his work and the proposed audit was never made.

About September 1, 1955, the parties again contacted Carroll and informed him that they wanted him to make an audit and at this time they were agreeing upon a figure for the inventory. In due course, Carroll and his firm proceeded to make the audit called for in the September 7 contract to purchase. This audit was completed on or about October 19, 1955, and an appropriate report made thereof.

Pursuant to the September 7 contract purchase, the capital stock of petitioner and the entirety of Pilcher's land and square 16 of Smiley Heights, and the improvements thereon were conveyed simultaneously to Barksdale and LeBlanc on November 22, 1955. The purchase price of the land with its improvements was $125,000, of which $68,378.45 was paid in cash, and, for the balance of said purchase price, Barksdale and LeBlanc assumed the payment of the balance of $56,621.55 remaining unpaid on a promissory installment note dated February 5, 1954, made and subscribed by Pilcher to the order of the American National Insurance Company of Galveston, Texas, the payment of which note was secured by a mortgage on the aforementioned real estate.

Petitioner's sales and net profit or loss for the fiscal years ended March 31, 1953, through March 31, 1956, are as follows:

| Period Mar. 31— | Sales | Net profit (or loss) |
|---|---|---|
| 1953 | $438,703.10 | $24,243.15 |
| 1954 | 345,731.43 | (7,986.91) |
| 1955 | 378,958.76 | (88,571.69) |
| 1956 [1] | 780,459.08 | 34,411.66 |

Petitioner on its corporate income tax return for the fiscal year ended March 31, 1956, computed its net operating loss deduction as follows:

[1]

| Period | Sales | Net profit (or loss) |
|---|---|---|
| Apr. 1, 1955, to Sept. 7, 1955 | $70,837.09 | ($50,695.53) |
| Sept. 8, 1955, to Mar. 31, 1956 | 709,621.99 | 85,107.19 |

Income per return
dated Mar. 31,
1956_____ [2] $34, 411. 66
Income per return
dated Mar. 31,
1953_____ $24, 248. 15
Operating loss per
return dated
Mar. 31, 1954_____ 7, 986. 91

Unused balance at
Mar. 31, 1954_____ $16, 261. 24
Operating loss per
return dated
Mar. 31, 1955_____ 88, 571. 69
Partial application of
loss at Mar. 31,
1955_____ 16, 261. 24 [2] 34, 411. 66

0 0

Net operating loss at
Mar. 31, 1955_____ $88, 571. 69
Less: Carryback to
Mar. 31, 1953_____ $16, 261. 24
Carryover to Mar.
31, 1956_____ 34, 411. 66 50, 672. 90

Remainder of loss yet to be carried over_____ $37, 898. 79.

The book value of petitioner's capital stock as of September 7, 1955, was $14,437.20; and Pilcher's adjusted basis of the land and improvements conveyed on November 22, 1955, was $41,870.34. Petitioner's balance sheet as of September 7, 1955, was as follows:

ASSETS

Current assets:
Cash on hand and in banks:
    Petty cash_____ $368.17
    American Bank & Tr. Co_____ 43.09
    City National Bank_____ 956.92
                                            $1, 368.18
Accounts receivable:
    Trade (Schedule No. 1)_____ 10, 674.27
    N.S.F. checks not cleared_____ 199.14
                                            10, 873.41
Accounts payable—debit balance (Schedule No.
    4)_____ 58.50
Merchandise inventory (estimate)_____ 90, 000.00
Accrued rent receivable_____ 345.00
Accrued interest receivable_____ 20.00
                                            $102, 665.09

[2] On the schedule "Net Operating Loss Deduction" of the return this figure is erroneously shown to be $35,588.09.

8

Noncurrent assets:

| | | | |
|---|---|---|---|
| Cash surrender value of life insurance policies (Schedule No. 2) | $7,868.11 | | |
| Less: Loans against such value | 6,830.73 | | |
| | | $1,037.38 | |
| Bonds—Winnborne Baptist Church | | 200.00 | |
| Due from stockholders: | | | |
| Tom Gillen, Jr | 968.85 | | |
| Walter Pilcher, Jr | 15,654.94 | | |
| | 16,623.79 | | |
| Less: Amount owed to Walter Pilcher, Sr | 7,106.02 | | |
| | | 9,517.77 | |
| Prepaid insurance | | 1,650.37 | |
| Prepaid taxes and licenses | | 283.35 | |
| Prepaid interest | | 78.15 | |
| | | | $12,767.02 |
| Fixed assets: | | | |
| Automobiles and trucks (Schedule No. 3) | 23,051.18 | | |
| Less: Accumulated depreciation | 8,223.14 | | |
| | | 14,828.04 | |
| Furniture and fixtures (Schedule No. 3) | 10,244.14 | | |
| Less: Accumulated depreciation | 4,229.63 | | |
| | | 6,014.51 | |
| | | | 20,842.55 |
| Total assets | | | 136,274.66 |

LIABILITIES

Current liabilities:

| | | | |
|---|---|---|---|
| Accounts receivable credit balances (Schedule No. 1) | | | $1,099.79 |
| Accounts payable: | | | |
| Trade (Schedule No. 4) | $44,826.93 | | |
| Lafayette Wholesale Supply Co., Inc | 2,492.82 | | |
| Other (Taxes collected and not remitted) | 959.69 | | |
| | | | 48,279.44 |
| Notes payable, due within one year: | | | |
| City National Bank (open) (Note No. 1) | 15,000.00 | | |
| American Bank and Trust Co. (open) (Note No. 1) | 46,000.00 | | |
| American Bank and Trust Co. (chattel mortgage on big truck and trailer) (Note No. 2) | 4,444.68 | | |
| | | | 65,444.68 |

Accrued expenses:

| | | |
|---|---:|---:|
| Interest | $200.00 | |
| State and local taxes | 2,727.84 | |
| Salaries and wages | 130.68 | |
| Insurance | 185.15 | |
| Payroll taxes | 124.62 | |
| Rent | 311.75 | |
| | | $3,680.04 |

$118,503.95

Noncurrent liabilities:
Note payable, due after one year:
American Bank and Trust Co.
(chattel mortgage on big truck
and trailer) _____ 3,333.51
Contingent liabilities (Note No. 3)

STOCKHOLDERS' EQUITY

Common stock, 3,800 shares with a par value of
$25 per share, issued and outstanding 1,371
shares _____ $34,275.00
Paid in surplus, premiums on stock sold, less premium on stock retired _____ 9,939.00
Earned surplus (deficit) _____ (29,230.80)

14,437.20

Total liabilities and stockholders' equity _____ 136,274.66

Under the provisions of the September 7 contract to purchase, a list of fixed assets shown on this audit report was to be revised as might be required to reflect the acquisition or disposition of any fixed assets since March 31, 1955. Accordingly, appropriate adjustments were made but not without some continuous discussion between LeBlanc and Pilcher. There were some items that Pilcher wanted to be paid for that LeBlanc thought he had already bought. Ultimately, after effect had been given to these adjustments, the book value of petitioner's stock was determined to be $12,529.21 at which price the capital stock was conveyed to Barksdale and LeBlanc.

While LeBlanc and Pilcher had been in the process of trying to settle one of the several controversies which had arisen in connection with the aforesaid adjustments (a question as to whether items such as shelving, curtains, and signs were or were not to have been included in the sale of the building or the business), LeBlanc complained to Carroll about the hard bargain Pilcher was driving. At that time Carroll informed LeBlanc that it would be better to get the matter settled. It was for the first time, in this conversation with Carroll, that LeBlanc learned that there might be some tax advantage involved

in the purchase of petitioner. Carroll had no part in any of the negotiations between Barksdale, LeBlanc, and Pilcher nor had the attorney who prepared the September 7 contract to purchase, and it was not until the above conversation with Carroll on or about October 18 that either LeBlanc or Barksdale became aware of the existence of petitioner's net operating loss carryover.

Although Carroll had known of the operating loss for the fiscal year March 31, 1955, he considered that his professional relationship to the parties prevented his informing Barksdale and LeBlanc that there was a possibility of a tax advantage and likewise prevented him from informing Pilcher that there was a possibility of some value in the operating losses, because both parties had had confidence in him to be fair. Until the audit of September 7 had been completed on or about October 18, 1955, Carroll knew nothing of the operating loss which petitioner had incurred during the period from April 1, 1955, to September 7, 1955.

The location of petitioner's business has remained the same as before the transfer of its stock ownership in 1955. The ownership of the land and buildings acquired from Pilcher in 1955 has remained in Barksdale and LeBlanc.

Both prior to September 7, 1955, and ever since that date, the principal business activity of petitioner has been the sale of building materials; the nature and type of business conducted by petitioner before and after the transfer of ownership of its capital stock has remained unchanged.

Prior to 1955, petitioner had been a semiexclusive distributor of plumbing supplies for American Radiator and Standard Sanitary Corporation (hereinafter referred to as American Standard). In January 1955, petitioner and American Standard, by mutual agreement, terminated this franchise. Shortly thereafter, American Standard awarded this distributorship to Capital Builders. Petitioner then conveyed to Capital Builders, at cost, certain American Standard plumbing fixtures and supplies in petitioner's inventory. After the dealership with American Standard was terminated, petitioner decided to discontinue handling any plumbing fixtures and supplies. Discontinuance of the American Standard franchise changed the complexion of the petitioner's business to some extent. Petitioner acquired no other dealership or franchise, either exclusive or semiexclusive for plumbing fixtures. Instead, it began closing out to inventory all plumbing fixtures and supplies.

When Capital Builders received the American Standard distributorship in March 1955, Capital Builders bought from petitioner all of its current models or styles of plumbing ware that American Standard

was making at that time. The plumbing supplies which petitioner conveyed to Capital Builders after the capital stock transfer consisted of the plumbing supplies that were left and which were odds and ends of plumbing, mostly pipe, nipples, fittings, incidental to the "business-getting" fixtures.

Barksdale and LeBlanc considered it to be a good business move to transfer and convey, as was done, the aforesaid residual "odds and ends of plumbing" from petitioner's inventory to Capital Builders, which corporation carried a major line of plumbing ware.

During 1955 (prior to September 7) and in the preceding years, Capital Builders had engaged in the sale of building materials and plumbing supplies. However, ever since November 22, 1955, when Barksdale and LeBlanc acquired the capital stock of petitioner, Capital Builders has engaged only in the sale of plumbing supplies; its inventory of building materials was conveyed to petitioner shortly after November 22, 1955. Prior to its withdrawal from the building materials business, Capital Builders had always kept its plumbing supplies business separate and distinct from its building supplies business.

Capital Builders' supply has always been a profitable operation. Its books are kept on a calendar year basis, and its gross sales in the years 1955 through 1958 are as follows:

| Year | Amount |
|------|--------|
| 1955 | $1, 924, 000. 00 |
| 1956 | 738, 361. 73 |
| 1957 | 855, 617. 22 |
| 1958 | 991, 932. 84 |

The 1956 decline in sales volume was attributable to the fact that Capital Builders no longer engaged in the building materials business.

In his notice of deficiency, respondent made the following determinations:

(a) The Net Operating Loss Deduction of $34,411.66 claimed on your return is disallowed under the provisions of Section 269 of the Internal Revenue Code of 1954.

(b) The operating loss sustained by you during the period April 1, 1955 to September 9, 1955 in the amount of $50,695.53 is disallowed under the provisions of Section 269 of the Internal Revenue Code of 1954.

The principal purpose of the acquisition by Barksdale and LeBlanc of all the stock of petitioner was not the evasion or avoidance of Federal income tax but was a bona fide business purpose.

12

The first issue for decision is whether Barksdale and LeBlanc acquired the stock of petitioner for the interdicted purpose of section 269 of the Internal Revenue Code of 1954.[3]

Respondent's theory of the case may be briefly stated as follows:

The acquisition of petitioner's capital stock by Barksdale and LeBlanc was solely for the purpose of avoiding tax. All of the elements necessary to the operation of the provisions of section 269(a) were present. Barksdale and LeBlanc acquired control of petitioner on September 8, 1955. Immediately, petitioner began making a profit. This profit was completely absorbed by the operating loss sustained by petitioner. Respondent, therefore, reasons that if petitioner had not been availed of by its controlling stockholders, petitioner could not have enjoyed the benefit of the losses.

Respondent points out that Barksdale and LeBlanc are successful businessmen, so successful they have never had a losing business venture; that they are conscious of tax consequences, seeking the advice and counsel of a certified public accountant and lawyer.

Respondent also points out that Barksdale and LeBlanc paid $12,529.21 for the stock of petitioner. The net adjusted basis of petitioner's property amounted to $14,437.20. The latter amount was based, among other assets, on an inventory having an assigned value of $90,000. After Barksdale and LeBlanc had selected $75,000 worth of such inventory, Pilcher purchased the remainder for $15,000. The net effect of the transaction was that Barksdale and LeBlanc acquired petitioner's stock for nothing. Clearly, the respondent says, the consideration paid was so substantially less than the sum of the adjusted basis of petitioner's property ($14,437.20), and the tax benefits received by virtue of the net operating loss from the year ended March 31, 1955 ($88,571.69), and the operating loss sustained for the period April 1, 1955, to September 9, 1955 ($50,695.53), that the transaction falls squarely within the purview of section 269(c).

The inquiry under section 269 is whether tax evasion or avoidance was the "principal purpose" of the acquisition. See *Commodores Point Terminal Corporation*, 11 T.C. 411 (1948); *Alcorn Wholesale*

---

[3] SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX.
   (a) IN GENERAL.—If—
      (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, * * *

   *      *      *      *      *      *      *

and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. * * *

*Co.*, 16 T.C. 75 (1951). We have found that such was not the case. There is no evidence that tax considerations were ever considered, but even if they had been, it does not follow automatically from the fact that tax consequences were considered, that tax avoidance was the "principal purpose." *Berland's Inc. of South Bend*, 16 T.C. 182 (1951).

Respondent contends that section 269(c) [4] creates a presumption of tax avoidance because the purchase price of the business was disproportionate to the adjusted basis of the property and the tax benefits to be derived. Section 269(c) does create a presumption of tax avoidance where there is a disproportionate purchase price. This is not a conclusive presumption, and in light of our finding of fact that the principal purpose of the acquisition was not tax avoidance, a finding based upon all the evidence of record, the presumption is rebutted.

Petitioner contends that section 269 has no application to the facts of this case for the reason that the section applies to the loss of the "acquiring" person and not to the loss of the "acquired" corporation. Further, petitioner contends that even if it be assumed that Barksdale and LeBlanc might receive some possible benefit from the allowance of the net operating losses to petitioner, the facts show that the obtaining of such possible benefit was not the "principal purpose" for the acquisition. The contention is that the acquisition was made for a legitimate and bona fide business purpose.

We are unable to agree with petitioner's first contention. It does not matter whether the actual deduction which produces the benefit is claimed by the acquiring person or the acquired corporation. In either event, if the principal purpose for the acquisition is the avoidance of tax, section 269 applies. *Thomas E. Snyder Sons Co.*, 34 T.C. 400 (1960), affd. 288 F. 2d. 36 (1961); *Urban Redevelopment Corporation*, 34 T.C. 845 (1960).

We agree with petitioner's second contention. The evidence in this case affirmatively establishes that the acquisition of the stock of petitioner was for a bona fide business purpose.

Barksdale and LeBlanc had a constant need to acquire more land to satisfy the requirements of their expanding business interests. From

---

[4] SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX.

.(c) PRESUMPTION IN CASE OF DISPROPORTIONATE PURCHASE PRICE.—The fact that the consideration paid upon an acquisition by any person or corporation described in subsection (a) is substantially disproportionate to the aggregate—

　　(1) of the adjusted basis of the property of the corporation (to the extent attributable to the interest acquired specified in paragraph (1) of subsection (a)), or of the property acquired specified in paragraph (2) of subsection (a) ; and

　　(2) of the tax benefits (to the extent not reflected in the adjusted basis of the property) not available to such person or corporation otherwise than as a result of such acquisition,

shall be prima facie evidence of the principal purpose of evasion or avoidance of Federal income tax. This subsection shall apply only with respect to acquisitions after March 1, 1954.

March 21, 1950, the date which Barksdale and LeBlanc purchased the original 13 lots and 40-foot strip, they individually or through their controlled corporation, Barkle, acquired 6 additional lots before they finally purchased Pilcher's remaining lots and business.

The evidence is that not even passing thought was given to the tax consequences of the acquisition. Barksdale and LeBlanc testified that they did not know of the losses until after the contract to purchase had been signed on September 7, 1955, and we believe their testimony. In fact, in January 1955 when Barksdale first contacted Pilcher about the acquisition of part of his land, the chances that anyone, much less Barksdale and LeBlanc, knew of any tax advantage was highly remote. Petitioner realized a profit of $24,248.15 for its fiscal year ended March 31, 1953; however, it incurred a loss of $7,986.91 for its fiscal year ended March 31, 1954. Since petitioner could carry this loss back to 1953, there was no obvious tax advantage to anyone acquiring petitioner. When Barksdale contacted Pilcher in January 1955, there remained 2 to 3 months before the end of the fiscal year.

We hold that Barksdale and LeBlanc acquired the stock of petitioner for a bona fide business purpose and not for the interdicted purposes set out in section 269.

### Issue 2.

The final question for decision is whether petitioner is entitled to a bad debt deduction in the amount of $1,211.72 for the fiscal year ended March 31, 1956. Petitioner introduced no evidence on this issue; therefore, the respondent's disallowance is sustained.

*Decision will be entered under Rule 50.*