INDUSTRIAL SUPPLIERS, INC., PETITIONER *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 1185–65.   Filed July 30, 1968.

*B. Stirling Tighe*, and *B. L. Tighe*, for the petitioner.
*Homer F. Benson*, for the respondent.

BRUCE, *Judge:* Respondent determined deficiencies in income taxes
and accumulated-earnings taxes against the petitioner for the calendar
years 1959, 1960, and 1961, in the aggregate amounts of $8,388.69,
$13,922.89, and $2,941, respectively. On brief, respondent has con-
ceded the deficiencies attributed to accumulated-earnings tax, leaving
in controversy deficiencies in income taxes in the respective amounts of
$4,254.75, $7,142.16, and $2,380.52. The deficiencies in income tax arose
out of respondent's disallowance of net operating loss deductions
claimed by petitioner as carryovers from preceding years.

The primary issue is whether petitioner is entitled to net operating
loss carryover deductions for the taxable years 1959, 1960, and 1961,
under the provisions of sections 172, 269, and 382 of the Internal
Revenue Code of 1954.[1]

### FINDINGS OF FACT

The stipulation of facts (corrected for mathematical errors) and
exhibits attached thereto are incorporated herein by reference. In view
of respondent's concession regarding the accumulated-earnings tax,

---

[1] All statutory references herein are to the Internal Revenue Code of 1954 unless other-
wise indicated.

only those facts deemed necessary to the determination of the remaining issue are hereinafter mentioned.

Petitioner is a corporation organized in 1945 under the laws of the State of Mississippi, with its principal office and place of business in Jackson, Miss. It kept its books and records and prepared its income tax returns on the accrual method of accounting. Its Federal corporation income tax returns for the calendar years 1959, 1960, and 1961 were filed with the district director of internal revenue at Jackson, Miss.

Petitioner's capital stock consisted of 500 shares of common and 1,500 shares of preferred stock, each of the par value of $100 per share. Prior to 1955 petitioner was owned or controlled by Robert Sanders or his family. Robert Sanders died prior to 1955, the exact date not shown. The Sanders family also owned or had interests in several other corporations, including Aponaug Manufacturing Co. and J. W. Sanders Cotton Mill. Petitioner owned stock in Sanders Motors, Inc., and Deep South Motor Co. As of December 31 of each of the years 1951 to 1954, inclusive, petitioner's investments in these two affiliated companies, as shown by its balance sheets, consisted of the following:

|  | Stocks, mortgages, and debentures | Accounts receivable |
| --- | --- | --- |
| Sanders Motors, Inc | $20,000 | $14,842.87 |
| Deep South Motor Co | 11,000 | 28,062.18 |

Its balance sheets also listed the following long-term indebtedness as of the end of each of the years 1951 to 1954, inclusive:

| | |
| --- | --- |
| Aponaug Mfg. Co | $395,000 |
| J. W. Sanders Cotton Mill | 190,000 |

Since its organization in 1945, petitioner has engaged in the business of selling hardware and industrial supplies at wholesale and retail. Prior to 1955 it operated throughout the State of Mississippi and was primarily a wholesaler. By 1955 petitioner's business had been substantially reduced and its affairs were being handled by one person.

Petitioner's net sales for the years 1950 to 1954, inclusive, were as follows:

| | |
| --- | --- |
| 1950 | $456,188.96 |
| 1951 | 637,012.84 |
| 1952 | 58,719.18 |
| 1953 | 45,381.79 |
| 1954 | 37,541.37 |

For the years prior to 1955 petitioner's books show operating losses as follows:

| | |
|---|---|
| 1945 through 1949 | $370, 253. 21 |
| 1950 | 27, 878. 90 |
| 1951 | 16, 992. 40 |
| 1952 | 26, 403. 76 |
| 1953 | 37, 541. 94 |
| 1954 | 28, 098. 55 |

Its surplus deficit at the end of each of the years 1950 to 1954, inclusive, was:

| | |
|---|---|
| 1950 | $373, 629. 41 |
| 1951 | 415, 005. 01 |
| 1952 | 441, 458. 27 |
| 1953 | 479, 000. 21 |
| 1954 | 507, 098. 76 |

The book value of petitioner's merchandise inventory at the end of each of the years 1950 to 1954, inclusive, was:

| | |
|---|---|
| 1950 | $280, 451. 50 |
| 1951 | 211, 161. 14 |
| 1952 | 207, 592. 31 |
| 1953 | 187, 399. 72 |
| 1954 | 165, 475. 00 |

In the spring of 1955 William Munger, president (or vice president) of the Deposit Guaranty Bank & Trust Co. (variously referred to as trustee of the Estate of Robert Sanders and as guardian of three named Sanders children), informed Wesley A. Caldwell that the business of Industrial Suppliers, Inc., was "for all practical purposes shut down" and that its stock was for sale. At that time, Caldwell owned an interest in Contractors Material Co., a corporation engaged in fabricating and selling steel and other building materials to contractors and builders at retail. Caldwell visited petitioner's premises several times and engaged Hal Brown, an experienced employee of another local hardware store, to make an appraisal of petitioner's inventory. He also had his own accountant make an examination of petitioner's books and accounts. Petitioner's inventory included a number of items which were obsolete and unsalable. Brown appraised the inventory at $80,000 to $100,000.

Thereafter, negotiations between Caldwell and the stockholders, heirs, and representatives of the Estate of Robert Sanders extended over a period of 3 or 4 months, in the course of which the parties entered into a number of agreements, written and oral, for the purchase and sale of petitioner's stock. Both Caldwell and the sellers were aware of the fact that the net operating losses sustained by petitioner

in the preceding years might be available as tax deductions from future profits of the corporation. One of the agreements, dated September 1, 1955, and signed on September 8, 1955, recites, in part, as follows:

> Now, THEREFORE, it is mutually agreed as follows:
>
> THAT the operations of Industrial Suppliers, Inc. for the past five years and more has resulted in operating losses.
>
> \*     \*     \*     \*     \*     \*     \*
>
> THAT the operations of the Industrial Suppliers, Inc. for the future will result in a profit and therefore the operating losses of said Company for past years will be available as a deduction for Federal Income Tax purposes.
>
> THAT the use of such operating losses and/or operating loss carryover will result in considerable Federal Income Tax savings.
>
> THAT both parties agree that the Federal Income Tax savings may not be realized by action of the Internal Revenue Department resulting in a decrease in the book value of the outstanding capital stock of Industrial Suppliers, Inc.

It was further agreed therein that the sellers should receive a minimum of $27.66 per share, "plus a participation per share in the 15% of any tax savings, arising solely from the use of the operating losses and/or operating loss carryover." This and previous agreements of the parties were canceled by mutual agreement and, "in or about August [sic]" or September 1955 all of the stock of petitioner—500 shares of common and 1,500 shares of preferred—was acquired by Caldwell and his associates for the total sum of $20,000. Thereafter, and during the taxable years, the common stock was owned as follows:

| Name of stockholder | Common stock owned |
|---|---|
| Wesley A. Caldwell | 347 |
| Augusta H. Caldwell | 30 |
| John H. Caldwell | 103 |
| Bernard L. Tighe | 20 |
| Total shares outstanding | 500 |

On December 31, 1956, all of the preferred stock of petitioner was canceled by action of the corporation.

In connection with the acquisition of the stock of petitioner, J. W. Sanders Cotton Mill, Inc., and Aponaug Manufacturing Co., on October 15, 1955, assigned the indebtedness due them by petitioner in the respective amounts of $190,000 and $395,000, to Eugene B. Davis, an employee of Caldwell, for the nominal consideration of $10 each. On January 2, 1956, Davis assigned these indebtednesses to Wesley A. Caldwell and, on January 5, 1960, Caldwell canceled each of the indebtednesses.

The following is a comparison of financial statements of petitioner as of December 31, 1954, and December 31, 1955, and an appraisal as of September 15, 1955:

## INDUSTRIAL SUPPLIERS, INC.

COMPARISON OF FINANCIAL STATEMENTS AS OF DEC. 31, 1954, SEPT. 15, 1955, AND DEC. 31, 1955

| | Per books, Dec. 31, 1954 | Appraisal of fair market value, Sept. 15, 1955 | Per books, Dec. 31, 1955 |
|---|---|---|---|
| *Assets* | | | |
| Current assets: | | | |
| Cash on hand and in bank | $5,350.80 | $1,380.85 | $12,263.49 |
| Trade accounts receivable | 12,258.49 | 1,920.42 | 101,249.54 |
| Other accounts receivable | 1,168.86 | 519.60 | 20,000.00 |
| Accounts receivable in judgment | 7,829.10 | | 7,829.10 |
| Merchandise inventory | 165,475.00 | 83,710.90 | 135,752.77 |
| Total current assets | 192,082.25 | 87,531.77 | 277,094.90 |
| Investments in affiliated companies: | | | |
| Accounts receivable: | | | |
| The Sanders Co | 42.37 | | |
| Sanders Motor Co | 14,842.87 | | |
| Deep South Motor Co | 28,062.18 | | |
| Stock owned: | | | |
| Sanders Motor Co | 20,000.00 | | |
| Deep South Motor Co | 11,000.00 | | |
| Fixed assets: | | | |
| Furniture and fixtures | 31,124.74 | 31,124.74 | 30,534.36 |
| Autos and trucks | 2,179.99 | 2,179.99 | |
| Warehouse fixtures | 5,739.65 | 5,739.65 | 5,739.65 |
| Inside equipment | 297.00 | 297.00 | |
| Leasehold improvements | 27,090.06 | 27,090.06 | |
| Total | 66,431.44 | 66,431.44 | 36,274.01 |
| Less reserve for depreciation | 53,427.53 | 56,427.53 | 28,797.06 |
| Total | 13,003.91 | 10,003.91 | 7,476.95 |
| Investment Steel Supply Co | | | 56,449.83 |
| Other assets: | | | |
| Utility deposits | 21.00 | 21.00 | 111.00 |
| Unexpired insurance | 106.91 | 56.91 | |
| Total | 279,161.49 | 97,613.59 | 341,132.68 |
| *Liabilities and capital* | | | |
| Current liabilities: | | | |
| Accounts payable | (194.00) | None | 1,040.86 |
| Excise taxes | 1,454.25 | $988.92 | 1,468.92 |
| Notes payable to banks | | | 112,000.00 |
| Due affiliated companies: | | | |
| Aponaug Mfg. Co | 395,000.00 | | 395,000.00 |
| J. W. Sanders Cotton Mill | 190,000.00 | | 190,000.00 |
| Capital stock | 200,000.00 | 50,000.00 | 200,000.00 |
| Surplus deficit | (507,098.76) | 46,624.67 | (558,377.10) |
| Total | 279,161.49 | 97,613.59 | 341,132.68 |

We certify that the above statements as of Dec. 31, 1954 and Dec. 31, 1955 are true and correct as per books of Industrial Suppliers, Inc. We further certify that the statement dated Sept. 15, 1955 represents an appraisal and valuation of the Fair Market Value of the assets and liabilities of Industrial Suppliers, Inc. as per this date.

INDUSTRIAL SUPPLIERS, INC.
(Signed) John H. Caldwell
JOHN H. CALDWELL, *President*
(Signed) W. A. Caldwell
W. A. CALDWELL, *Secretary*

In 1956, the fair market value of petitioner's inventory was reduced to $79,260.20, due to obsolescence and the unsalability of a large part of it, and the net book value of its furniture and fixtures as of the close of 1955 was shown as $7,476.95.

In June 1955 Contractors Material Co. entered into a joint venture with three other companies—Taylor Wheeler Construction Co., M. T. Reed Construction Co., and Ruby Construction Co.—d.b.a. Coosa Constructors, for the construction of an ammunition depot at Anniston, Ala., at a cost of $13 million under a contract with the Corps of Engineers, U.S. Army. Thereafter, and after Caldwell and his associates had acquired the capital stock of petitioner, petitioner and three other companies—Forrest Equipment Rental Co., the Delta Co., and Ruby Engineering Co.—entered into a joint venture or operations agreement, d.b.a. Steel Supply Co., for the purpose, among other things, of acquiring and furnishing steel and steel products to Coosa Constructors for use in the construction of the ammunition depot at Anniston. Each of the members of Steel Supply Co. was affiliated through common stockholders with one of the members of Coosa Constructors, in the respective order listed above. Thus, for example, petitioner was an affiliate of Contractors Material.

Some of the steel used on the Government project was obtained from Republic Steel Corp. in the following manner. At that time steel was in short supply and could only be obtained on priorities. Contractors Material had such a priority but petitioner did not. Accordingly, Republic sold, shipped to, and billed Contractors Material for the steel. Petitioner paid these bills and, under the operations agreement, treated the profit realized as that of Steel Supply Co. Similar transactions took place, beginning in the latter part of 1955, and in 1956 and possibly 1957. The contruction contract was completed in 1958 and Steel Supply Co. did not operate thereafter. Petitioner's income tax return and balance sheets for 1955 and 1956 reported accounts receivable from Steel Supply Co. in the amounts of $56,449.83 and $166,760.60, respectively, and none thereafter. Petitioner reported income from Steel Supply Co. in the amount of $36,449.83 in 1955 and $110,310.77 in 1956, a loss of $3,222.18 in 1957, income in the amount of $262.99 in 1958, and $3,531.18 in 1959.

Subsequent to their acquisition of petitioner's stock in August or September 1955, the stockholders continued the operation of the petitioner primarily as a wholesale dealer in hardware and building material. Except for the steel involved in the Steel Supply Co. transaction, the items handled were substantially of the same character handled by petitioner prior to acquisition. New inventory was acquired as business developed. Petitioner's business was conducted at the same location on

Highway 80 West until sometime in 1958 when, due to the cancellation of its lease, it purchased its own building and moved to its present location on Highway 80 East at Fannin Road in Jackson, some 3 or 4 miles from its original location. Hal Brown was employed under a 5-year contract of employment as manager. At first he had one helper. The number of employees was subsequently increased to seven.

For the period 1955 to 1961, inclusive, petitioner's merchandise inventory on hand at the end of each year was as follows:

| | | | |
|---|---|---|---|
| 1955 | $135,752.77 | 1959 | $104,803.06 |
| 1956 | [1] 79,260.20 | 1960 | 109,797.04 |
| 1957 | 92,651.10 | 1961 | 111,871.29 |
| 1958 | 90,110.63 | | |

[1] In 1956 its inventory was written down $45,820 due to obsolescence and unsalability.

During the same period, its net sales were:

| | | | |
|---|---|---|---|
| 1955 | $319,747.37 | 1959 | $186,475.91 |
| 1956 | 48,396.62 | 1960 | 183,252.78 |
| 1957 | 62,954.25 | 1961 | 179,154.98 |
| 1958 | 133,024.98 | | |

For the periods subsequent to the acquisition of its stock by Caldwell and his associates, petitioner's books show operating gains and losses as follows:

| | Gains | Losses |
|---|---|---|
| 1955 | | ($51,278.34) |
| 1956 | $19,540.43 | |
| 1957 | | (3,215.38) |
| 1958 | 10,819.98 | |
| 1959 | 15,032.50 | |
| 1960 | 24,657.19 | |
| 1961 | 7,186.83 | |
| Total | 77,236.93 | (54,493.72) |
| Net operating gain | 22,743.21 | |

Paragraph 6(b) of the stipulation of facts is as follows:

"The petitioner's books show that a portion of the 1955 operating loss of petitioner in the amount of $51,278.34 resulted when deductions were claimed on petitioner's 1955 income tax return for losses on the capital stock and accounts receivable of affiliated or subsidiary companies of petitioner occurring when said subsidiaries, namely, Sanders Motor Company (a corporation) and Deep South Motor Company (a corporation) were liquidated. Both of these subsidiary corporations filed final income tax returns with the Internal Revenue Service showing a total operating loss in the total amount of $71,895.05, which was

reflected in the books of petitioner and which was constituted as follows:

| | |
|---|---|
| Capital stock, Sanders Motor Co | $20,000.00 |
| Capital stock, Deep South Motor Co | 11,000.00 |
| Accounts receivable, Sanders Motor Co | 14,842.87 |
| Accounts receivable, Deep South Motor Co | 28,062.18 |
| Total | 73,905.05 |
| Less sale of Sanders Motor Co. stock to R. E. Dumas Milner | 2,000.00 |
| Total | 71,905.05 |
| Less collection from Sanders Co | 10.00 |
| Loss on affiliated companies—common stock and receivables on sale and liquidation in 1955 | 71,895.05" |

A detailed "Profit and Loss Statement Year Ended December 31, 1955," attached to petitioner's income tax return for 1955 (Exh. 5), here condensed, is as follows:

| | | |
|---|---|---|
| Sales | | $319,747.37 |
| Less cost of sales | | 301,150.42 |
| Gross trading profits | | 18,596.95 |
| Operating costs | | 24,905.26 |
| Gross loss on operations | | 6,308.31 |
| Other income | $38,248.39 | |
| Other expense | 83,218.42 | |
| | | 44,970.03 |
| Net loss on operations | | 51,278.34 |

Included in the item "Other expense" are—

| | |
|---|---|
| Loss/stock, affiliated cos | 31,000.00 |
| Loss/accts., affiliated cos | 40,895.05 |

These are explained in a statement attached thereto as follows:

| | |
|---|---|
| Capital stock—Sanders Motor Co | $20,000.00 |
| Capital stock—Deep South Motor Co | 11,000.00 |
| Accounts receivable—Sanders Motor Co | 14,842.87 |
| Accounts receivable—Deep South Motor Co | 28,062.18 |
| Total | 73,905.05 |
| Sold the above for | 2,000.00 |
| Total | 71,905.05 |
| Less collection from the Sanders Co | 10.00 |
| Loss on affiliated companies stock and receivables | 71,895.05 |

In computing its taxable income for the years subsequent to the acquisition of its stock by Caldwell and his associates, petitioner

claimed deductions for net operating loss carryovers on its Federal income tax returns as follows:

(1) The net operating losses shown for 1951 and 1952 in the respective amounts of $16,992.40 and $26,403.76, totaling $43,393.16 (sic), were carried over and applied against the net operating profit for the year 1956 in the amount of $19,540.43 (sic).

(2) The net operating loss shown for 1953 in the amount of $37,-541.94 was carried over and applied against the net operating profit for the year 1958 in the amount of $10,819.98.[2]

(3) The net operating loss shown for 1954 in the amount of $28,098.55 was carried over and applied against the net operating profit for the year 1959 in the amount of $15,032.50.

(4) The net operating loss shown for 1955 in the amount of $51,278.34 was carried over and applied against the net operating profit for the year 1960 in the amount of $24,657.19.

(5) The net operating loss shown for 1957 in the amount of $3,215.38 was carried over and applied against the net operating profit for the year 1961 in the amount of $7,186.83.

Loss carryovers from the operations prior to acquisition were as follows:

| Carryover year | Loss carryovers | Profits against which carryover applied | To year | Tax rate (percent) | Tax saved |
|---|---|---|---|---|---|
| 1951 | $16,992.40 | | | | |
| 1952 | 26,403.76 | $19,540.43 | 1956 | 30 | $5,862.12 |
| 1953 | 37,541.94 | 10,819.98 | 1958 | 30 | 3,246.00 |
| 1954 | 28,098.55 | 15,032.50 | 1959 | 30 | 4,509.75 |
| Total tax saved per returns from loss carryovers prior to acquisition | | | | | 13,617.87 |

The principal purpose for the acquisition of the stock of petitioner in 1955 was the evasion or avoidance of Federal income tax, within the meaning of section 269(a) of the Internal Revenue Code of 1954.

Petitioner sustained a net operating loss for the year 1955 which could be carried over to the taxable year 1960 and a net operating loss for the year 1957 which could be carried over to the taxable year 1961.

OPINION

In its Federal income tax returns for the years 1959, 1960 and 1961, petitioner claimed deductions for net operating loss carryovers from

[2] The tax liabilities of the petitioner for the years 1956 and 1958 are not before the Court. The statements relating thereto contained in paragraphs (1) and (2) above are included for bearing, if any, they may have on the question of purpose or intent referred to in sec. 269.

**644**

1954, 1955, and 1957, respectively. Respondent disallowed each of the claimed deductions, the explanation given in the statement attached to the notice of deficiency being "because you have not established that you are entitled to the deduction."

On brief, respondent states that "all the above-mentioned net operating loss carryovers" were disallowed "because of the determination that the principal purpose for acquiring the petitioner was the evasion or avoidance of tax by securing the benefit of deductions, credits or other allowances which the stockholders or the corporation otherwise would not have enjoyed," as provided by section 269 of the Internal Revenue Code of 1954.[3]

In the alternative, respondent contends that "the net operating losses sustained in 1955 and prior years may not be carried over to years subsequent to the year of acquisition for the further reason that the business was not continued without substantial change," citing section 382 of the Internal Revenue Code of 1954.[4]

---

[3] SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX.

(a) In General.—If—

(1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, * * *

* * * * * * *

and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. * * *

* * * * * * *

(c) PRESUMPTION IN CASE OF DISPROPORTIONATE PURCHASE PRICE.—The fact that the consideration paid upon an acquisition by any person or corporation described in subsection (a) is substantially disproportionate to the aggregate—

(1) of the adjusted basis of the property of the corporation (to the extent attributable to the interest acquired specified in paragraph (1) of subsection (a)), or of the property acquired specified in paragraph (2) of subsection (a) ; and

(2) of the tax benefits (to the extent not reflected in the adjusted basis of the property) not available to such person or corporation otherwise than as a result of such acquisition,

shall be prima facie evidence of the principal purpose of evasion or avoidance of Federal income tax. This subsection shall apply only with respect to acquisitions after March 1, 1954.

[4] SEC. 382. SPECIAL LIMITATIONS ON NET OPERATING LOSS CARRYOVERS.

(a) PURCHASE OF A CORPORATION AND CHANGE IN ITS TRADE OR BUSINESS.—

(1) IN GENERAL.—If, at the end of a taxable year of a corporation—

(A) any one or more of those persons described in paragraph (2) own a percentage of the total fair market value of the outstanding stock of such corporation which is at least 50 percentage points more than such person or persons owned at—

(i) the beginning of such taxable year, or

(ii) the beginning of the prior taxable year,

(B) the increase in percentage points at the end of such taxable year is attributable to—

(i) a purchase by such person or persons of such stock, the stock of another corporation owning stock in such corporation, or an interest in a partnership or trust owning stock in such corporation, or

* * * * * * *

(C) such corporation has not continued to carry on a trade or business substantially

With respect to the deduction claimed by petitioner for a net operating loss carryover from 1955 to the taxable year 1960, respondent further contends that petitioner is not entitled to a deductible loss carryover from 1955 to 1960, for the reason that it has failed to establish that the corporate stock and accounts receivable on which the claimed loss is based were not in fact worthless prior to 1955.

In general, section 172 [5] of the Internal Revenue Code of 1954 provides for the carryover of net operating losses to certain subsequent years. The deductibility of such carryover losses is specifically limited, however, by the provisions of sections 269 and 382. We do not understand that there is any controversy herein as to the years to which the claimed loss carryovers may be applied under section 172, or with respect to the change of ownership or control of petitioner under sections 269 and 382. Sections 269 and 382 are not, however, applicable to the net operating loss carryovers from 1955 to 1960 and from 1957 to 1961, since the losses there involved did not occur prior to the acquisition of petitioner's stock by Caldwell and his associates in 1955. Accordingly, each of the taxable years in question will be considered separately.

*NOLC from 1954 to 1959.*—Section 269(a) provides generally that if any person or persons acquire control of a corporation and the principal purpose for such acquisition was the evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction (here a net operating loss deduction) shall not be allowed. This section has been applied to disallow a deduction or other tax benefit, to the acquired corporation if the principal purpose of the acquiring person or persons was tax avoidance. *Thomas E. Snyder Sons Co.*, 34 T.C. 400 (1960), affd. 288 F. 2d 36 (C.A. 7, 1961); *Baton Rouge Supply Co.*, 36 T.C. 1 (1961); *H. F. Ramsey Co.*, 43 T.C. 500 (1965).

Respondent's determination is presumptively correct and the burden is on the petitioner to prove that tax avoidance was not the principal purpose of Caldwell and his associates in acquiring control of petitioner. In addition, respondent points out that section 269(c) imposes a presumption of tax avoidance where the amount paid for the stock

the same as that conducted before any change in the percentage ownership of the fair market value of such stock,

the net operating loss carryovers, if any, from prior taxable years of such corporation to such taxable year and subsequent taxable years shall not be included in the net operating loss deduction for such taxable year and subsequent taxable years.

[5] SEC. 172. NET OPERATING LOSS DEDUCTION

(a) DEDUCTION ALLOWED.—There shall be allowed as a deduction for the taxable year an amount equal to the aggregate of (1) the net operating loss carryovers to such year, plus (2) the net operating loss carrybacks to such year. * * *

was substantially disproportionate to the aggregate of the adjusted basis of the corporate property and of the tax benefits not available to such person or corporation otherwise than as a result of such acquisition. Just why this should be so where, as here, the amount paid was *less* than the value of the corporate assets escapes us. In any event, the legislative history indicates this is a "procedural device" and not a conclusive presumption. H. Rept. No. 1337, 83d Cong., 2d Sess., p. A67; S. Rept. No. 1622, 83d Cong., 2d Sess., p. 39; Conf. Rept. No. 2543, 83d Cong., 2d Sess., pp. 32–33. See also *H. F. Ramsey Co., supra; Baton Rouge Supply Co., supra.*

The basic questions are essentially factual and are to be determined from all the facts and circumstances of the particular case.

Caldwell, petitioner's principal stockholder, admitted on the witness stand that he was fully aware of the net operating losses which had been incurred by petitioner in the previous years and the tax benefits which might be derived from such losses, also that he had received tax advice concerning these matters from the attorney representing petitioner in this case. This awareness is further evidenced by the agreement dated September 1, 1955, referred to in our Findings of Fact.

Petitioner contends that tax avoidance was not the principal purpose for the acquisition of its stock by the Caldwells. Wesley A. Caldwell, the principal stockholder and only witness at the trial of this proceeding, testified they paid $20,000 for the stock of the company because the inventory had a value considerably in excess of the amount they paid, that they would have purchased the stock even if there had been no loss carryovers, and that the tax benefit was not a consideration for their purchase of the stock. The inventory had a book value of $165,425 at the beginning of 1955, and Brown, whom Caldwell had engaged to appraise it, advised him it was worth $80,000 to $100,000 if properly merchandised.

We have no doubt that Caldwell was interested in acquiring petitioner's inventory at what he considered to be a bargain price and, on first impression, this would appear to be a valid, business purpose for the acquisition of petitioner's stock. We are not convinced, however, that the tax benefits to be derived from the carryover of previous net operating losses was not the principal purpose for acquiring the inventory *through the purchase of petitioner's stock* rather than by a simply purchase of the inventory itself. The purchase of the stock and the various manipulations which this involved, as well as the subsequent utilization of petitioner in the Steel Supply Co. venture, thereby creating additional profits against which the loss carryovers could be applied, belies Caldwell's testimony that the tax benefits were not a consideration for the purchase of the stock.

There is no evidence the previous stockholders would not have been willing to sell the inventory without disposing of the stock. This, of course, would have deprived the purchasers of the benefits of the loss carryover deductions. It would have made unnecessary, however, the transfers of the indebtednesses which petitioner owed to Aponaug Manufacturing Co. and J. W. Sanders Cotton Mill, Inc., first to Davis, the nominee of Caldwell, then by Davis to Caldwell and finally the cancellation of such indebtedness by Caldwell.[6] It would also have made unnecessary the subsequent liquidation or sale by the acquiring stockholders of the corporate stock and accounts receivable of the Sanders Motor Co. and the Deep South Motor Co., and their cancellation of the preferred stock of the petitioner.

That tax avoidance was the principal purpose for the acquisition of petitioner's stock is further evidenced by the following transactions. Contractors Material Co., of which Caldwell was apparently the principal stockholder, and three other companies entered into a joint venture, d.b.a. Coosa Constructors, for the construction of an ammunition depot at Anniston, Ala., at a cost of $13 million, under a contract with the U.S. Army Corps of Engineers. In connection with this project, petitioner and three other companies, each an affiliate of one of the prime contractors, entered into a joint venture or operation agreement, d.b.a. Steel Supply Co., for the purpose, among other things, of acquiring and furnishing steel and steel products to Coosa Constructors, for use in the construction of the ammunition depot. Steel was in short supply and could only be obtained on priorities. Contractors Material had such a priority but petitioner did not. Contractors Material was engaged in and had facilities for the fabrication of steel products; petitioner did not. Some of the steel used on the project was acquired by having Republic Steel Corp. *sell*, *ship to*, and *bill* Contractors Material for the steel. Petitioner paid the bills and treated the profit realized as that of Steel Supply Co. Transactions of this character took place beginning in the latter part of 1955 and in 1956 and 1957. Petitioner reported income from Steel Supply Co. in the amount of $36,449.83 in 1955 and $110,310.77 in 1956, a loss of $3,222.18 in 1957,

---

[6] The significance of the acquiring stockholder, Caldwell, obtaining and thereafter for more than 4 years retaining control of the indebtednesses owed by petitioner to Aponaug Manufacturing Co. and J. W. Sanders Cotton Mill, Inc., has not been explained and is not readily apparent. Obviously, the Sanders family, which owned or controlled these companies as well as petitioner, considered the obligations of no value since they transferred them for the nominal consideration of $10 each. It is reasonable to surmise Caldwell considered them as a possible source of tax benefit, through application of future operating profits as payments on indebtedness, in the event operating loss carryover deductions might not be available or the basis of the investment in petitioner's stock should be questioned. The indebtednesses were not canceled until after operating loss carryover deductions for 1956 and 1958 had been asserted and not questioned. These manipulations are further indications of the tax consciousness of petitioner's acquiring stockholders.

and income in the amount of $262.99 in 1958, and $3,531.18 in 1959. The years 1955 to 1958, inclusive, are not before the Court. Facts concerning those years may, however, be considered for the purpose of determining deficiencies, if any, for the open years. Sec. 6214(b); *State Farming Co.*, 40 T.C. 774, 782 (1963); *Commissioner* v. *Disston*, 325 U.S. 442, 449 (1945). Such facts are particularly relevant here in determining the "principal purpose" in the acquisition of the stock of petitioner and the applicability of section 269 to the years before the Court.

We do not question Caldwell's right to choose which of the corporations he controlled he would use in the conduct of business, but the choice here and particularly the method used in conducting the business indicate a purpose to secure additional tax benefits through the carryover of petitioner's preacquisition net operating losses. Although Caldwell had had an appraisal made of petitioner's inventory shortly after he became aware that petitioner's stock was for sale in the spring of 1955, the purchase of the stock was not finally effected until after Contractors Material had entered into the joint venture for the construction of the ammunition depot, and, it is reasonable to presume, Caldwell was aware of the potential use of petitioner in connection with the Steel Supply Co. venture or operation agreement. It is noteworthy that the income derived from the Steel Supply Co. venture in 1955 and 1956 was considerably greater than the profits derived from the operation of petitioner's hardware and industrial supplies business.

These manipulations and others in the record raise an inescapable inference that tax avoidance was the principal purpose for the acquisition of petitioner's stock. Cf. *Thomas E. Snyder Sons Co.* v. *Commissioner*, 288 F.2d 36, 39 (C.A. 7, 1961), affirming 34 T.C. 400. We so hold and, accordingly, sustain respondent's disallowance of the net operating loss deduction for the taxable year 1959.

In view of the above conclusion, it is not necessary to consider respondent's alternative contention concerning the application of section 382. In this connection, however, it might be observed that although petitoner's hardware and industrial supplies business was substantially reduced in the 2 or 3 years immediately preceding the sale of its stock in 1955, apparently due to the death of its principal stockholder and poor management, it had not in fact ceased to engage in such business and its net sales from this type of business steadily increased after the Caldwells acquired control. The Steel Supply Co. business which was engaged in principally during the years 1955 and 1956, was a temporary enlargement similar to the addition of an additional line of products. In any event the Steel Supply Co. ceased

operations upon completion of the ammunition depot in 1958, and petitioner's business during the taxable years involved—1959, 1960, and 1961—was not substantially different from the trade or business it had conducted prior to the acquisition of its stock.

*NOLC from 1955 to 1960.*—Neither section 269 nor 382 is applicable to the taxable year 1960, since the net operating loss involved was not incurred prior to the acquisition of petitioner's stock. Respondent contends, however, that petitioner is not entitled to a deductible loss carryover from 1955 to 1960 for the reason that petitioner has failed to establish that the corporate stock and accounts receivable, on which the claimed loss is based, became worthless in 1955 and were not in fact worthless prior to 1955.

Both petitioner's books and tax return show a net operating loss for 1955 in the amount of $51,278.34, which resulted from the taking of deductions for losses on the capital stock and accounts receivable due from Sanders Motor Co. and Deep South Motor Co., affiliates or subsidiaries of petitioner. It was stipulated the loss resulted when these companies "were liquidated." It was further stipulated, however, that the stock of Sanders Motor Co. was sold and that a collection, though small, was made from the Sanders Co. The two are inconsistent. The sale of the stock of a corporation does not constitute a liquidation of that corporation. The sale of the stock and collection on the account, shown by petitioner's books and return and admitted by respondent, at least with respect to the Sanders Co., are evidence the stock and account were not entirely worthless prior to 1955, and was sufficient to shift the burden of going forward with the proof to respondent. This he did not do and, as admitted on reply brief, he had made no investigation as to the actual worthlessness of the stock or accounts receivable of either corporation. Even if we related the sale of stock and collection only to the Sanders Motor Co., as indicated in the stipulation, the loss ($34,842.87 less $2,010) would still be more than sufficient to offset the profit ($24,657.19) in the taxable year 1960. We hold that the petitioner sustained a net operating loss for the year 1955 which could be carried over to the taxable year 1960.

*NOLC from 1957 to 1961.*—The net operating loss which was carried over from 1957 to 1961 was incurred subsequent to the acquisition of petitioner's stock in 1955. Other than his general contentions that the principal purpose for the acquisition was the evasion or avoidance of tax within the meaning of section 269, and alternatively, that petitioner had not continued to carry on a trade or business substantially the same as that conducted prior to the acquisition, within the meaning of section 382, respondent has offered no explanation or ground for the dis-

650

allowance of the deduction claimed for 1961. It is clear that neither section 269 nor 382 is applicable. Accordingly, we reject respondent's determination and hold that petitioner is entitled to the claimed net operating loss deduction for the taxable year 1961.

*Decision will be entered under Rule 50.*