JOSEPH B. DURRETT, JR. AND CAROLYN C. DURRETT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Durrett v. Commissioner
Docket No. 21771-84
United States Tax Court
T.C. Memo 1994-179; 1994 Tax Ct. Memo LEXIS 179; 67 T.C.M. (CCH) 2735; April 21, 1994, Filed *179 An appropriate order will be issued denying petitioners' motion for leave to amend petition and decision will be entered under Rule 155. The notice of deficiency in this case involving the taxable years 1979, 1980, and 1981 was mailed to Ps on April 3, 1984. The deficiencies resulted primarily from the disallowances of losses claimed with regard to straddle transactions with First Western Government Securities, Inc. This Court sustained the disallowance of similar losses in Freytag v. Commissioner, 89 T.C. 849 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. on other grounds 501 U.S.    , 111 S. Ct. 2631 (1991). Ps do not dispute the deficiencies and concede that the transactions involved here are indistinguishable from those in Freytag. Ps, however, contest the additions to tax for negligence and the increased interest under sec. 6621(c), I.R.C.
Ps filed their petition in this case on June 29, 1984. Ps filed their 1983 Federal income tax return in October 1984. That return showed a "tentative regular investment tax credit" that was not used in the computation of the tax liability *180 for that year. The credit is derived from the activities of a partnership subject to secs. 6221 through 6233, I.R.C., (the partnership provisions of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, 96 Stat. 324). R did not commence an administrative proceeding with respect to the partnership and did not examine Ps' 1983 return. This case was calendered for trial on April 29, 1993. On April 21, 1993, Ps moved to amend their petition to raise for the first time an investment tax credit carryback from 1983 to 1980. Ps contend that the credit is an "affected item" that cannot be challenged in these proceedings. Held: 1. This Court has jurisdiction under sec. 6214(b), I.R.C., to consider whether there is an investment tax credit to be carried back to the 1980 year. Hill v. Commissioner, 95 T.C. 437 (1990); Mennuto v. Commissioner, 56 T.C. 910, 922-923 (1971), followed. 2. Ps' motion to amend is untimely and will be denied. 3. R's determinations concerning increased interest under sec. 6621(c) and negligence under sec. 6653(a), I.R.C., are sustained. For petitioners: Thomas *181 E. Redding, Paul J. Coselli, David C. Holland, Alan L. Tinsley, and Charles B. Koerth. For respondent: Paul J. Krug. DAWSON, POWEL DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: This case was assigned to Special Trial Judge Carleton D. Powell pursuant to section 7443A(b)(4) and Rules 180, 181, and 183. [1] The Court agrees with and adopts the opinion of the Special Trial Judge which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE POWELL, Special Trial Judge: By notice of deficiency dated April 3, 1984, respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Additions to Tax
Years
Deficiency
Sec. 6653(a)(1) Sec. 6653(a)(2) 1979
$ 68,279
$ 3,414.00
---
1980
858,193
42,909.65
---
1981
196,220
9,811.00
[1]
*182 In an amended answer, respondent asserted that the deficiencies for all the years in issue were substantial underpayments due to tax-motivated transactions, and that the increased rate of interest under section 6621(c) was applicable. At the time the petition was timely filed petitioners resided in Houston, Texas. The issues are: (1) Whether petitioners may amend their petition to claim an investment tax credit carryback from 1983 to the 1980 taxable year; (2) whether the increased interest provisions of section 6621(c) apply; and (3) whether petitioners are liable for additions to tax under section 6653(a). FINDINGS OF FACT 1. Facts Concerning the Motion For Leave to Amend the Petition
Petitioners were represented by counsel at all relevant times. The notice of deficiency in this case was issued on April 3, 1984, and the petition was timely filed on June 29, 1984. Petitioners' 1983 Federal income tax return was filed on or about October 15, 1984. On that return petitioners showed a "tentative regular investment credit" in the amount of $ 95,766; they did not claim, however, any credit because of other limitations on credit arising from the alternative minimum tax. *183 This case was calendared for trial on the negligence and section 6621(c) issues commencing on April 29, 1993. On April 21, 1993, petitioners filed a Motion for Leave to Amend Petition, and lodged with the Court a proposed First Amendment to Petition. The proposed amendment states, inter alia: Petitioners are entitled in 1980 to a[n] * * * investment tax credit carryback from 1983 based on their 1983 Form 1040 as originally filed.
The 1983 investment tax credit arises from the activities of a partnership subject to sections 6221 through 6233 (the partnership provisions of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, 96 Stat. 324). In addition to the potential credit, petitioners' 1983 return also claims substantial losses from other partnership and farming activities. Respondent did not commence an administrative proceeding with respect to the partnership and did not examine petitioners' 1983 return. Respondent opposes the motion for leave to amend. In so doing, respondent alleges that she would suffer prejudice because the files concerning the 1983 return are now unavailable. 2. Facts Concerning the Additions to Tax and Section *184 6621
The deficiencies in this case result, in part, [2] from the disallowance of partnership losses in the following amounts: Ordinary
Short Term Capital
Partnership
Year
Income
Loss
Gain
Loss
10179
1979
-0-
($ 143,235)
-0-  -0-  10179
1980
-0-
(524)
-0-  -0-  5180
[1] 1980
-0-
(391,422)
$ 962,962
($ 964,061)
5180
1981
-0-
(398,043)
-0-  -0-  The partnership gains and losses arise from alleged straddle transactions of forward contracts for government-backed financial securities with First Western Government Securities, *185 Inc. (First Western). The First Western losses were the subject of this Court's opinion in Freytag v. Commissioner, 89 T.C. 849 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. on other grounds 501 U.S.    , 111 S. Ct. 2631 (1991). After a lengthy trial, this Court found, based on that record, inter alia, that "The transactions between First Western and its customers were illusory and fictitious and not bona fide transactions." Freytag v. Commissioner, 89 T.C. at 875. This Court alternatively held that, even if the transactions had substance, they "were entered into primarily, if not solely, for tax-avoidance purposes." Id. at 876. Based on the finding that the transactions were not bona fide, this Court concluded that additional interest under section 6621(c) was due on the underpayments. Id. at 886-887. In concluding that the transactions were not bona fide, this Court examined various aspects of the First Western program, including the risk of profit and loss, the hedging operation, the margins *186 required and fees charged, the pricing of the forward contracts that were involved, and the manner in which the transactions were closed. In all of these areas we found that the First Western operations were deficient and not conducted as they should have been if bona fide financial transactions were being conducted. With respect to the losses, this Court noted: Petitioners' portfolios were constructed so as to achieve their desired tax losses. In this regard, the most important required data supplied by petitioners were their requested tax losses. Indeed, the program could not be implemented without the tax information. Thus, in analyzing the program for a profit standpoint, from the first, the tax tail wagged an economic dog. * * * [Id. at 878.]
We also pointed out that there were other "gremlins" in First Western's world that dispelled the notion that these transactions were bottomed in financial reality -- reversing transactions months later, confirmations being months late, transactions being made with no documentation, etc. . Id. at 882. In the case currently before the Court, petitioner [3] concedes *187 that the transactions with First Western were conducted in the same way as the transactions discussed in Freytag, i.e., the same pricing algorithms were used, the transactions were closed in the same way, etc. He does not contest the disallowance of the losses claimed. He does, however, contest the increased interest under section 6621(c) and the additions to tax for negligence under section 6653(a). Petitioner has a degree in chemical engineering. In 1976 he started his own business, Chemical Exchange (Chemical). Chemical's (and petitioner's) primary business was buying and selling fuel oil. Petitioner was president of Chemical and information concerning the profitability of the corporation was available to him at all times. By 1979, the business had become very successful. Petitioner's compensations from Chemical were $ 333,562.50, *188 $ 516,987, and $ 605,658, respectively for the taxable years 1979, 1980, and 1981. Petitioner's withheld taxes for each year were $ 16,168, $ 16,546, and $ 26,953, respectively. Petitioner was introduced into First Western's world by Allen Daniels (Daniels). Daniels is an attorney with apparently a general business practice. He is not an expert in financial markets or in tax advantaged investments; he had, however, advised petitioner with respect to a truck leasing venture that was successful. Through Daniels, petitioner was introduced to Kenneth McCoin (McCoin) who was with Mosher, McCoin & Sims, Inc., a firm that provides investment advice. McCoin told petitioner and Daniels that he had reviewed the First Western operations and that they appeared to be a bona fide business. Although McCoin explained the First Western program to petitioner and Daniels, neither understood how the program worked. Petitioner testified that I don't think I had ever been acquainted with a straddle before, but he [McCoin] said that [is] what we would do -- what I understood to do -- and contrary to what everybody has been talking about, I had never heard of a formula. I thought we were buying *189 some sort of a bond, and then we were buying bonds on the other side; buying Freddie Macs and selling Fannie Maes or vice versa. There was some difference in the interest [rates] between those two, and we could make some money on that. Frankly, I didn't understand.
In short, both petitioner and Daniels relied on McCoin. McCoin was a so-called "finder" for First Western; he was paid by First Western for putting clients into the First Western program. He had approximately 100 clients in the First Western program and the firm was paid over $ 600,000 by First Western. Petitioner and Daniels were aware that McCoin was paid by First Western. McCoin also was an investor in the programs and claimed deductions from purported losses. Freytag v. Commissioner, 89 T.C. at 873-875. With regard to the firm of Mosher, McCoin & Sims, Inc., we noted: The corporation [Mosher, McCoin & Sims, Inc.] prepared various presentations of the First Western program for its customers in which it was pointed out that, even if the customer lost his entire margin, he would make a profit from tax savings. The following statement was made by the corporation: "Cash *190 deposit 17% of writeoff should expect to lose all of cash deposit any profit left at end of transaction is 'gravy'" * * *. Mosher, McCoin & Sims had reviewed a pamphlet prepared apparently in 1978 by First Western * * * that provided, inter alia: One time margin equal to 10% of the tax writeoff * * *. * * * No other cash or margin deposits are required. * * * If customer is correct in his interest rate direction, he will receive a check from First Western in the amount of up to 60% of his initial margin * * *. Note that the tax writeoff could be as high as 25 to 1. [Id. at 875.]
Daniels also suggested that petitioner get advice on the tax ramifications of the First Western transactions from Jerry Chambers (Chambers), a C.P.A. Chambers was not asked to give advice as to the bona fides of the transactions. Chambers reviewed the offering memorandum from First Western; as to the bona fides of the operations of First Western, however, he relied on McCoin and to some extent on Daniels. Chambers knew that there was no public market for these transactions. While he had some experience in straddle transactions involving transactions on *191 the Chicago Board of Trade, Chambers had no experience with financial transactions of the type that were involved in the First Western programs. Chambers was also aware that McCoin was being paid by First Western. Chambers warned petitioner that there was a possibility that the deductions would be disallowed by respondent and that the disallowance "might" be sustained by the Tax Court. Petitioner's involvement in First Western was, as mentioned, through two partnerships. One of the partners was Leslie Jecko (Jecko) who also worked for Chemical as the "financial officer". Jecko was present when petitioner and Daniels met with McCoin and he knew that McCoin was paid by First Western. Jecko handled the transactions with First Western and prepared the partnership returns. Jecko understood that the loss leg of the straddle would be cancelled in the first year. He could not recall whether he requested a specific tax loss. The records of First Western show, inter alia, that the 1979 partnership requested a $ 300,000 ordinary loss in 1979 and a long-term capital gain of that amount in 1981. The 1979 loss from the First Western alleged trading was $ 303,000, and petitioner claimed *192 a deduction of his aliquot share of the loss in the amount of $ 143,235. For the 1980 partnership, an ordinary loss in the amount of $ 525,000 in 1980 and a corresponding long-term capital gain in 1982 were requested. For 1981, a $ 600,000 ordinary loss and a 1983 long-term gain were requested. Petitioner claimed losses in the amounts of $ 391,422 and $ 398,043 arising from the 1980 partnership for the taxable years 1980 and 1981. OPINION 1. Motion for Leave to Amend Petition
Rule 41(a) provides, in part: Amendments: A party may amend a pleading once as a matter of course at any time before a responsive pleading is served. * * * Otherwise a party may amend a pleading only by leave of Court or by written consent of the adverse party, and leave shall be given freely when justice so requires. No amendment shall be allowed after expiration of the time for filing the petition, however, which would involve conferring jurisdiction on the Court over a matter which otherwise would not come within its jurisdiction under the petition as then on file. * * * In this case, the motion for leave was not filed before the responsive pleading, and respondent has not consented *193 to the motion. The motion is addressed, therefore, to the sound discretion of the court. Avatar Exploration, Inc. v. Chevron, U.S.A., Inc., 933 F.2d 314, 320 (5th Cir. 1991). In exercising that discretion, the courts consider various factors including the timeliness of the motion, the reasons for the delay, and whether granting the motion would result in issues being presented in a seriatim fashion. Daves v. Payless Cashways, Inc., 661 F.2d 1022, 1024 (5th Cir. 1981). Perhaps the most important consideration is whether undue prejudice would result to the other party. Evans Products Co. v. West American Ins. Co., 736 F.2d 920, 924 (3d Cir. 1984); Russo v. Commissioner, 98 T.C. 28, 31 (1992). As to the timeliness of the motion, petitioner contends that at the time that the petition was filed he had no reason to know that the carryback credit existed because he filed the petition before the 1983 return was filed. This may be so, but, when he filed the 1983 return in October, 1984, he knew of the 1980 deficiency, and he also had been warned by Chambers that *194 he might not prevail on the First Western issue. By 1987, when our opinion in Freytag v. Commissioner, supra, was filed, he certainly knew that there was a problem with the 1980 liability. Furthermore, even if respondent's files concerning the partnership were available, a reconstruction of 10-year old transactions would be difficult, if not impossible, and prejudice to the other party is manifest. Finally, by waiting to the eve of trial, petitioner has presented a situation where, if an evidentiary hearing would be necessary, seriatim trials would be mandated. While tacitly recognizing these problems, petitioner contends that another trial is not necessary, and respondent would not be prejudiced because everything is in this record to decide the issue. This reasoning is predicated on a perceived relationship between the rules for deficiency litigation (subchapter B of chapter 63) and the rules governing so-called TEFRA partnership litigation contained in subchapter C of chapter 63. The partnership provisions of subchapter C of chapter 63 were added by section 402(a) of TEFRA, 96 Stat. 648. A "partnership item" is determined at the partnership level. Sec. 6221. A *195 "partnership item" is an item "more appropriately determined at the partnership level than at the partner level" to the extent prescribed by the regulations. Sec. 6231(a)(3). Subchapter C also uses the concept of an "affected item", which is defined as "any item to the extent such item is affected by a partnership item." Sec. 6231(a)(5). Although an investment credit is taken into account separately by each partner, sec. 702(a); Southern v. Commissioner, 87 T.C. 49, 53 (1986), under the regulations investments "necessary to enable the partnership or partners to determine" investment credits from the partnership are considered partnership items. Sec. 301.6231(a)(3)-1(a)(1)(vi), Proced. & Admin. Regs. The carryback of an investment tax credit, however, is an affected item. Maxwell v. Commissioner, 87 T.C. 783, 790 (1986). Petitioner contends that the 1983 investment tax credit arises from investments made by a TEFRA partnership and that the credit is a "partnership item" properly determined at the partnership level. Petitioner reasons that, because respondent has not challenged the partnership return and the period *196 of limitations under section 6229 has expired, the partnership item of that return cannot be challenged in a TEFRA proceeding. Furthermore, because the carryback of the credit is an affected item, this Court has no jurisdiction to consider a challenge to the claim with respect to the 1980 taxable year. Respondent, relying on section 6214(b), disagrees. Section 6214(b) provides: Jurisdiction Over Other Years and Quarters. -- The Tax Court in redetermining a deficiency of income tax for any taxable year * * * shall consider such facts with relation to the taxes for other years * * * as may be necessary correctly to redetermine the amount of such deficiency, but in so doing shall have no jurisdiction to determine whether or not the tax for any other year * * * has been overpaid or underpaid.
Section 6214(b) is a subject matter jurisdictional statute. In dealing with items from a later year where no notice of deficiency had been issued for that year, this Court is without jurisdiction to redetermine whether a tax liability for that year has been underpaid or overpaid. Notwithstanding this, under the first part of section 6214(b), in redetermining the tax liability for the *197 year properly before this Court, Congress instructs that this Court "shall consider such facts with relation to the taxes for other years * * * as may be necessary correctly to redetermine the amount of such deficiency". This Court has long held that we have jurisdiction to consider the claim of an investment tax credit carryover or carryback to a year that is before this Court where the credit arises in a year that is not before this Court and would otherwise be barred by the period of limitations. Hill v. Commissioner, 95 T.C. 437 (1990); Mennuto v. Commissioner, 56 T.C. 910, 923 (1971); Brock v. Commissioner, T.C. Memo. 1982-335; see also Lone Manor Farms, Inc. v. Commissioner, 61 T.C. 436, 439-441 (1974), affd. without published opinion 510 F.2d 970 (3d Cir. 1975) (same with regard to net operating loss carrybacks and carryovers). [4] This is true even if it would involve recomputing the tax liability in the other year to determine whether credit could be carried back or over. Hill v. Commissioner, supra at 441-442. *198 Respondent argues that there is nothing in either the statutory framework of the TEFRA provisions or its legislative history indicating that Congress intended to repeal section 6214(b) and the case law based thereon. We agree. In Roberts v. Commissioner, 94 T.C. 853 (1990), the taxpayers claimed deductions from losses from three TEFRA partnerships. There were no partnership administrative actions commenced with respect to those partnerships, and the period of limitations with respect to the partnerships had expired. Respondent issued a notice of deficiency disallowing a carryback of an investment credit from the partnerships, inter alia, on the ground that *199 the taxpayers were not "at risk" under section 465. Taxpayers moved to dismiss on the ground that such an "affected item" could not be litigated in a deficiency proceeding. Taxpayers relied "on our statement in Maxwell that 'Affected items depend on partnership level determinations, [and] cannot be tried as part of the personal tax case, and must await the outcome of a partnership proceeding.' Maxwell v. Commissioner, supra at 792." Id. at 860. This Court stated: However, the "outcome of the partnership proceeding" may be acceptance of the partnership return as filed as a result of the fact that there was no partnership proceeding and there can no longer be a partnership proceeding under the normal statute of limitations. We do not read section 6230(a)(2)(A)(i) to mean that a partnership proceeding must be opened and closed in order for there to be a determination with regard to an affected item. We also find no requirement in the statute or regulations that prohibits affected items from being considered in a proceeding involving a personal tax case, providing subject matter jurisdiction exists. [ *200 Roberts v. Commissioner, supra at 860-861; emphasis added.]
In the instant case, respondent does not contend that she can reopen the 1983 taxable year. Nonetheless, in redetermining the correct tax for the 1980 taxable year, respondent insists that, if petitioner is allowed to amend the petition to raise the carryback, then under section 6214(b), this Court has jurisdiction to consider whether the carryback is proper. Petitioner does not directly address this argument. Rather, petitioner contends that our opinion in Harris v. Commissioner, 99 T.C. 121 (1992), affd. 16 F.3d 75 (5th Cir. 1994), directs that we must allow the claimed carryback as set forth on the 1983 return. [5] In Harris the taxpayer was before this Court in a deficiency proceeding. During the Rule 155 computation petitioner sought to amend the petition and raise net operating loss carrybacks from two classes of TEFRA partnerships. In one class, there was a settlement of the TEFRA partnership items reached between respondent and the partnership. In the other class, settlement of the administrative proceedings was *201 under consideration; no settlement, however, had been reached. With regard to the settled partnership items, we noted when the Commissioner and a partner enter into a settlement those items become nonpartnership items under section 6231(b)(1)(C). Respondent contended, however, that the procedure for taking into account TEFRA partnership carrybacks was governed by the TEFRA procedures and "not by the provisions ordinarily governing the redetermination of deficiencies, such as section 6214(b)." Harris v. Commissioner, supra at 125. Respondent argued that under section 6230(a)(2)(A)(ii) a settlement is applied to a partner by a computational adjustment and not under the ordinary deficiency and refund procedures. We rejected *202 this argument stating We, however, do not read the provisions of section 6230(a)(2)(A)(ii) * * * as depriving us of jurisdiction to take account of the settled items pursuant to section 6214(b). The purpose of section 6230(a)(2)(A)(ii) is to enable the Commissioner to collect amounts due as a result of settlements without the necessity of issuing a statutory notice of deficiency, and we find no suggestion that such provision was intended to restrict the jurisdiction of this Court in the situation present in the instant case. * * * [Id. at 126.]
As to the other partnerships, we concluded that "prior to the resolution of partnership level proceedings, partnership and affected items may not be taken into account in a partner's personal tax case." Id. at 127 (citations omitted). In Harris we commented that such cases as Hill and Lone Manor Farms, Inc. "did not involve the TEFRA partnership provisions and, consequently, do not resolve the issue before us." Id. at 125. As we understand petitioner's contention, the Court thereby rejected the rationale of these cases in any *203 situation where a carryback or carryover emanates from a TEFRA partnership regardless of whether there is or was a partnership administrative proceeding. See sec. 6223. This states too much. In Harris, there were pending or settled administrative proceedings, and the rationale of Hill and Lone Manor Farms, Inc. did not apply. But it is vastly a different matter to say that in situations where there has been no partnership administrative proceeding, the TEFRA partnership rules prohibit this Court from examining the merits of a claimed carryback or carryover in conjunction with determining the correct tax liability in an individual's case under section 6214(b). Indeed, as noted supra, this Court rejected the contention that the partnership provisions restricted our jurisdiction under section 6214(b) where the partnership items had been settled. In short, the Harris case, to the extent that it is apposite, supports respondent's position. If we were to allow petitioner to amend his petition to raise the carryback, we then would have to consider all of the attendant questions involving the availability of that credit to be carried back including not only the *204 bona fides of the credit but the correct tax liability for 1983. [6]Hill v. Commissioner, 95 T.C. 437 (1990). This involves the probability of another trial in this case. Furthermore, it is difficult to imagine a situation where an opposing party could be more prejudiced. Petitioners had ample time to raise this issue, and they failed to do so. In these circumstances, justice would not be served by allowing petitioners to amend the petition at this late date. The motion for leave to file will be denied. [7]
*205 2A. Section 6621(c)
Petitioners contend that the increased interest under section 6621(c) is inapplicable to them, relying on Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408. [8]Section 6621(c)(1) provides that, if there is a "substantial underpayment attributable to tax-motivated transactions," the interest payable under section 6601 "shall be 120 percent of the underpayment rate". A substantial underpayment attributable to a tax-motivated transaction means "any underpayment of taxes * * * attributable to 1 or more tax-motivated transactions if the amount of the underpayment for such year * * * exceeds $ 1,000." Sec. 6621(c)(2). The term "tax motivated transactions" means, inter alia, "any sham or fraudulent transaction." Sec. 6621(c)(3)(v). From a literal reading of the statute, if a transaction is determined to be a "sham", the increased interest applies. *206 In Freytag v. Commissioner, 89 T.C. 849, 887 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. on other grounds 501 U.S.    , 111 S. Ct. 2631 (1991), we sustained respondent's determinations that section 6621(c) applied to the First Western underpayments based on our finding that the transactions were "shams." Because petitioners concede that their transactions with First Western were identical to those in Freytag, additional interest under section 6621(c) is applicable here. [9] See Howard v. Commissioner, 931 F.2d 578, 582 (9th Cir. 1991), affg. T.C. Memo. 1988-531. *207 Heasley v. Commissioner, supra, is inapposite. In Heasley v. Commissioner, T.C. Memo. 1988-408, this Court found that the transactions entered into were not entered into for profit, and, therefore, under section 301.6621-2T, Q&A-4, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50392 (Dec. 28, 1984), the increased interest under section 6621(c) was applicable. The Court of Appeals for the Fifth Circuit concluded, however, that the taxpayers had "the requisite profit motive." Heasley v. Commissioner, 902 F.2d at 386. While it is true that in Freytag v. Commissioner, 89 T.C. at 882-886, we held, in the alternative, that the transactions were not entered into for profit, we sustained the additional interest under section 6621(c) on the ground that the alleged transactions factually were illusory and fictitious, i.e., "shams", a finding affirmed by the Court of Appeals for the Fifth Circuit in Freytag v. Commissioner, 904 F.2d at 1015-1016, and it is upon that ground that we sustain respondent's determination here. Petitioners, *208 however, contend that for a transaction to be considered a sham under section 6621(c)(3)(v) the transaction must be without economic substance and be entered into without a profit objective, citing Heasley v. Commissioner, supra. While, as discussed infra, we reject their contention that there was a profit motive, we do not read the Fifth Circuit Court of Appeals' opinion in Heasley, not its opinion in Lukens v. Commissioner, 945 F.2d 92, 99-100 (5th Cir. 1991), affg. Ames v. Commissioner, T.C. Memo. 1990-87, to stand for this proposition. When a transaction is the simple product of smoke and mirrors, it is a factual sham, regardless whether the taxpayer may have thought that a profit might have been made. See Cherin v. Commissioner, 89 T.C. 986, 993-994 (1987). This is all that section 6621(c)(3)(v) requires. See Statement of the Managers attached to the conference report, H. Conf. Rept. 99-841. II-796 (1986), 1986-3 C.B. (Vol. 4) 796. 2B. Negligence
Respondent determined that additions to tax under section 6653(a) are due for negligence. *209 Section 6653(a) provides in relevant part that "If any part of any underpayment * * * is due to negligence or intentional disregard of rules and regulations * * * there shall be added to the tax an amount equal to 5 percent of the underpayment." "'Negligence is a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" Freytag v. Commissioner, 89 T.C. at 887 (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. on this issue 43 T.C. 168 (1964)); see also Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982). Petitioners have the burden of establishing that their actions were not negligent. Freytag v. Commissioner, 904 F.2d at 1017. The negligence question focuses on petitioner Joseph B. Durrett, Jr. He entered into the transactions with First Western. Petitioner contends that the addition to tax under section 6653(a) is unwarranted because he had a reasonable expectation for profit, and *210 he exercised due care when he entered into the transactions with First Western. The gravamens of his contention are that he relied on expert advice and that his motive for entering into the transactions was not to avoid taxes. With regard to petitioner's reliance on experts, such reliance, standing alone, will not insulate a taxpayer from the addition to tax for negligence. It must be shown that the expert had the expertise and knowledge of the pertinent facts to render such an opinion on the subject matter. Freytag v. Commissioner, 89 T.C. at 888. Furthermore, it must be established that the person rendering the advice is independent and does not have an economic interest in giving the advice. Rybak v. Commissioner, 91 T.C. 524, 565 (1988). Petitioner has a background in engineering and petroleum sales. Prior to 1979, he had made no investments in any transactions of this nature. He was told about the First Western program by Daniels. Daniels had no expertise in dealing with straddles in forward contracts that were the heart of the First Western program. Neither petitioner nor Daniels understood how the program *211 worked. Rather, Daniels relied upon McCoin and Chambers, and the latter relied on Daniels and also on McCoin. According to petitioner's version of what happened, there were four blind mice, [10] all duped by one slick cat, McCoin. We believe that the mice, rather than being blind, suffered more from tax-motivated myopia and they stand in pari delicto with the cat. Cf. Horn v. Commissioner, 90 T.C. 908, 941 (1988). All knew that McCoin had a direct relationship with First Western and was paid by First Western. While the facts here are somewhat more convoluted, our words in Rybak v. Commissioner, supra at 565, apply: In these circumstances, petitioners did not rely on competent, independent parties; they did no more than inquire of the promoter if the investment was sound. Such reliance is not the type of activity which will overcome the addition to tax for negligence or intentional disregard of the rules and regulations.
*212 See also Marine v. Commissioner, 92 T.C. 958, 992 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991); Patin v. Commissioner, 88 T.C. 1086, 1130 (1987), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). It must be noted that these transactions could hardly be described as being run-of-the-mill, and petitioner admits that he did not understand the transactions. They involved alleged forward contracts to purchase and sell millions of dollars of mortgage-backed securities. See Freytag v. Commissioner, 89 T.C. at 862-863. There was no market for these contracts, and First Western was on both sides of the transactions. In discussing the First Western transactions, the Court of Appeals *213 for the Fifth Circuit noted: "no reasonable investor would surrender total control of his or her ability to profit or lose unless satisfied that the risk of loss had been greatly diminished or eliminated." [Freytag v. Commissioner, 904 F.2d at 1016 (quoting Sochin v. Commissioner, 843 F.2d 351, 356 (9th Cir. 1988).
Furthermore, the ratio of the tax losses compared with the payments was huge, between 8:1 and 10:1. This latter fact was particularly important because, as the Court of Appeals for the Ninth Circuit recognized in Zmuda v. Commissioner, 731 F.2d at 1422, during this period there was "extensive continuing press coverage of questionable tax shelter plans." As we noted in our opinion in Freytag v. Commissioner, 89 T.C. at 888, given this scenario, a taxpayer could not merely rely on the documents supplied by First Western, and further investigation was clearly mandated. If there had been any serious examination of the program, "No reasonable person would have expected * * * [the] scheme to work." Freytag v. Commissioner, 89 T.C. at 889. *214 Cf. Hanson v. Commissioner, 696 F.2d 1232, 1234 (9th Cir. 1983), affg. per curiam T.C. Memo. 1981-675. Finally, we note that petitioner's alleged profit motive for the First Western transactions is simply cut from whole cloth. The raison d'etre of the program was to convert ordinary income into long-term capital gains and defer the payment of taxes. Jecko understood this. Nonetheless, petitioner steadfastly contends that this was not the reason for his investment and denies that he knew anything about the requests for tax losses that were supplied to First Western. This has a decidedly hollow ring. First, without the losses from First Western, petitioner faced substantial tax liabilities in each of the years arising from his salary because of the underwithholding on his salary." [11] Second, if we were to accept petitioner's argument, we would have to accept that the requests for tax losses, which appear to be well tailored to his situation, materialized out of thin air for all 3 years. We decline that invitation. Third, it is inconceivable to us, given the relationship that McCoin had with First Western and the internal *215 documents that his firm had and produced, that the profit potential of First Western played any significant part of McCoin's discussion with petitioner or petitioner's decision to invest. [12] Fourth, it is also unlikely that anyone whose primary purpose was to make a profit would enter into a transaction when he lacked any understanding of what was going on. The only rational explanation for any of this is that petitioner entered into these transactions with the primary, if not sole, objective of obtaining the tax losses. *216 Petitioner, relying again on Heasley, suggests that he did all that was necessary because he was an "unsophisticated" investor. It is true that the Court of Appeals for the Fifth Circuit in Heasley found that "moderate-income" and "unsophisticated" investors were not negligent when they failed to do more to investigate an investment in a tax shelter. Heasley v. Commissioner, 902 F.2d at 383-384. That case is distinguishable, however, from the one before us here. In this regard, we are continually surprised to discover, after Heasley, how the definition of an "unsophisticated" and "moderate-income" investor has been expanded to include well educated persons who have established or been engaged in lucrative businesses for many years. Indeed, if petitioner fits within that description, it would appear that at least some of the taxpayers in Freytag were similarly situated. But, in Freytag the additions to tax for negligence were affirmed by the same court that had decided Heasley just a month before. Heasley does not shield petitioner from additions to tax for negligence. Petitioners have not shown that they used due *217 care, and respondent's determinations with respect to the additions to tax under section 6653(a) are sustained. An appropriate order will be issued denying petitioners' motion for leave to amend petition and decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. 50 percent of the interest due on the underpayment.↩
2. In the notice of deficiency, respondent made other adjustments. By stipulation, the parties have resolved these issues. The other adjustments are mathematical and will be resolved during the Rule 155 computations.↩
1. For 1980, respondent disallowed all losses but did not take the short term capital gain out of the computation of the deficiency for that year. The parties have stipulated that neither the gains nor losses will be recognized.↩
3. The deficiencies and additions to tax focus on the activities of petitioner Joseph B. Durrett, Jr. with First Western, and for convenience he will be referred to as petitioner.↩
4. See also Phoenix Coal Co. v. Commissioner, 231 F.2d 420 (2d Cir. 1956), affg. T.C. Memo. 1955-28; Calumet Ind., Inc. v. Commissioner, 95 T.C. 257 (1990); State Farming Co. v. Commissioner, 40 T.C. 774↩ (1963).
5. Although petitioner does not expressly concede the point, he apparently acknowledges that, if the rationale of Hill v. Commissioner, 95 T.C. 437↩ (1990), and its antecedents apply, the motion for leave to file should be denied.
6. Putting aside the investment tax credit issue, respondent would be entitled to question all items on petitioners' 1983 return to determine whether there was an investment tax credit to be carried back.↩
7. Petitioner suggests that the Court applied a different standard when it allowed respondent to file an amended answer raising the increased interest under sec. 6621(c). In 1985, this Court issued guidelines for raising the increased interest under sec. 6621(c) in cases that were currently before this Court. See Cinman v. Commissioner, T.C. Memo. 1991-192. Under those guidelines, the basic concern as to the timeliness of respondent's motion was whether the petitioners were afforded time to prepare for trial. Id. This case was calendared for a pretrial hearing on Oct. 5, 1992. On Aug. 31, 1992, respondent filed a Motion for Leave to File First Amendment↩ to Answer and lodged with the Court a proposed amended answer raising the increased interest issue. At that hearing the Court gave notice that the case would be calendared for trial during the week of Apr. 26, 1993, and subsequently the case was calendared for trial commencing Apr. 29, 1993. When we granted respondent's motion for leave on Oct. 5, 1992, there was ample time for petitioners to prepare the issue for trial. The same cannot be said of the motion that is currently before the Court.
8. Petitioners also raised but have not pursued the constitutionality of sec. 6621(c). We have rejected that argument. Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005↩ (2d Cir. 1986).
9. Because the increased interest under sec. 6621(c) was raised for the first time in the amended answer, the burden of proof is on respondent to establish that the provision applies. While petitioners have not conceded that the First Western transactions were "shams", they conceded that the transactions were the same as involved in Freytag v. Commissioner, 89 T.C. 849 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. on other grounds 501 U.S.    , 111 S. Ct. 2631 (1991), and we held that the transactions in Freyteg were shams within the meaning of sec. 6621(c)(3)(v). Our findings in Freytag↩ were not based on a failure of proof, but rather affirmative evidence that was in the record. Which party bears the burden of proof is, therefore, not relevant here.
10. Petitioner claims that he relied on Daniels, Jecko, and Chambers. Jecko relied on McCoin. Daniels relied on McCoin and Chambers. Chambers claimed that he relied on Daniels to some extent. It is peculiar that Chambers would rely on Daniels' advice when Daniels recommended that they seek Chambers' advice in the first place. We have a circle of the blind leading the blind.↩
11. Petitioner claims that because a large part of his salary was from bonuses based on Chemical's profits, he did not know what, if any, bonuses would be paid. Petitioner was president of Chemical, had access to all financial information, and surely knew at any time where Chemical stood. Despite denials, he clearly knew that Chemical was making substantial profits.↩
12. We recognize that McCoin denied knowledge of his firm's statements concerning the First Western program. We do not believe that is the case.↩